# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-DP-00317-SCT

*KEVIN SCOTT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/23/1998 |
| TRIAL JUDGE: | HON. KENNETH L. THOMAS |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | RAYMOND L. WONG |
| | CLIVE ADRIAN STAFFORD-SMITH |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:    JUDY T. MARTIN |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | LAURENCE Y. MELLEN |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 06/10/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1.    Kevin Scott (Scott) appeals his capital murder conviction and sentence of death determined by a Bolivar County Circuit Court jury.  The jury returned a guilty verdict against Scott as to Count I of the indictment finding that he killed seventy-four year old Richard Lee (Lee) on November 15, 1995, in the course of a robbery.  After a separate sentencing hearing, the jury determined that Scott should be given the penalty of death for the capital murder of Lee.  The trial court entered judgment and sentenced Scott

to death by lethal injection as provided by Miss. Code Ann. § 99-19-51, for the capital murder of Lee. The jury also found Scott guilty as to Count II of the indictment for aggravated assault of Lee's wife, Lurline Lee (Lurline). Scott was sentenced to serve a term of ten (10) years for the aggravated assault. Scott subsequently made a motion for judgment of acquittal notwithstanding the verdict or in the alternative a new trial. The trial court denied Scott's motion. Scott filed his notice of appeal in forma pauperis to this Court.

## FACTS

¶2. On November 14, 1995, Scott wrecked his white 1988 Oldsmobile Sierra with a luggage rack on the trunk. The next day, Scot and Leroy Lynch (Lynch) went to Cleveland, Mississippi. Scott had borrowed his brother's car.

¶3. Lurline testified that on Wednesday, November 15, 1995, she and Lee were living in Boyle, Mississippi. They had been married for almost 52 years, lacking a month and four days. Lee who was 74 years old, was retired. Lee had gone that day to Jitney-Jungle in Cleveland, Mississippi, to pick up some sandwiches as well as make some other stops to pick up things to stock their camper. The Lees were preparing to visit their daughter, Sandra Dixon, on Friday and then their deer camp in Kosciusko, Mississippi.

¶4. Lee left the house around 11:00 a.m. The Lees owned a white 1990 Oldsmobile Sierra with a luggage rack on the trunk. Lee returned home shortly after noon. Lurline could hear Lee drive in the carport. She heard talking outside. When Lee did not come inside, she went to the door. Lurline saw their car in the carport and a black guy wearing a cap standing by the driver's side of their car. Lee was still in the car. She heard Lee say, "Well, what do you want me to do?" Lee had his hands lifted. Lurline pointed to and identified Scott at trial at the man that she saw on her carport.

¶5. Lurline testified:

2

I opened the door to see what was going on. And I suppose he heard the door open, because my husband did. And he looked up, and my husband just matter of factly, like, this is it, you know, and says, "Honey, he's got a gun." And the minute – the second he said that, that boy over there raised that gun and started firing at me. Twice I saw the fire.

But the minute I saw, I was – I ducked down and shoved the door with my arm and ran around the corner into the bathroom. I went in there and I locked the door and called 911. And I just sat on the floor scared death.

¶6.     Lurline testified that she saw the pistol. Lurline testified that when Scott raised the pistol to fire twice at her, she ducked. One of the bullets deflected off of the door as she slammed it causing it to shoot across the family room through the bedroom wall and into the dresser and mirror. Lurline did not come out of the bathroom until the police arrived approximately 4-5 minutes later. The police would not allow her to see her husband. Lurline testified she never saw Lee alive again. Lurline testified that she never saw Scott before that day, "[b]ut I will remember you as long as I live. You took my husband from me."

¶7.     Robert Haney (Officer Haney) testified that on November 15, 1995, he was employed at the Delta State University Police Department. On that day, Officer Haney had been in Clarksdale, Mississippi, investigating a credit card fraud case that had occurred on campus. Officer Haney was driving his campus patrol car. Over the radio he heard radio traffic concerning a shooting in Boyle. Officer Haney requested further description of the car. The description provided was a 1990 Oldsmobile Sierra, white in color, with a luggage rack on the back. Approximately two miles inside of Bolivar County, Mississippi, he noticed a car that met that description. The driver was a black male wearing a baseball type cap.

¶8.     After performing the internal checklist as to what he was supposed to look for, Officer Haney began pursuit. Officer Haney attempted to get the tag number. He informed Bolivar County that he was in pursuit. Officer Haney testified that he was doing in the neighborhood of 115 miles an hour with his blue

lights running. The car never pulled over, but it did turn off onto Bobo Road. He lost sight of the car, but he noticed tracks where a car had spun out of control. He followed the tracks and located the car.

¶9. The car was empty when Officer Haney discovered it. The car was in a field near an abandoned gin in Bobo. Officer Haney radioed the state police network for assistance. Approximately ten minutes later, three units from Clarksdale arrived to assist. The tag number was confirmed as being the Lees' automobile. Later, units from Bolivar County also arrived at the scene.

¶10. Ida Mae Zanders (Zanders) testified that on November 15, 1995, she lived in Bobo, Mississippi. At around 12:30 or 1:00 p.m. that day, a black male came to her house and asked to use her telephone. She had never seen him before that day. She testified that she felt strange, but she allowed him to use her telephone. He identified himself to her as Kevin Scott. She testified that he was acting "funny." Since he was a stranger, Zanders testified she continued to hold her butcher knife that she had been using to cook.

¶11. He walked to her back door and saw that she had a car outside. He asked Zanders to drive him home. She told him that she could not leave because she was waiting on her grandson to get out of school. Scott thanked her and left. She testified that he had been there for only approximately three minutes. When he left, she locked her door.

¶12. Doris Ivy (Doris), a resident of Bobo, Mississippi, testified that on November 15, 1995, approximately between 12:30 and 1:00 p.m., a young man met her as she was coming out of her trailer. He asked her for a ride. Doris testified that he scared her. He was "sweating." He asked if he could be dropped off at the Davenport turn. Doris told him she was not going that way. He had a baseball cap in his hands. According to Doris, even though it was cool outside, he was not wearing a jacket. He acted nervous and in a rush to get home.

4

¶13.    Doris told the man that her husband , Steven Ivy (Steven), might be able to give him a ride.  He knocked on the door.  Doris's husband was in the kitchen.  Doris testified that it was approximately 12:45 p.m.  Doris was on her way to a meeting.  Doris did not leave until her husband came out of the trailer. She pulled her husband aside to discuss Scott in private.  Steven stated he knew Scott identifying him as "Diane and Parnell's son."

¶14.    Steven agreed to drive Scott home.  Doris and Steven left at the same time.  She followed Steven to the store.  Doris noticed all the police cars in the area.  As she continued to follow her husband, Doris saw Lynch turn off of Hwy. 61 and turn on Davenport – Bobo Road in front of her.  Doris was in a hurry to get to her meeting.  Lynch was driving extremely slow.  Lynch then pulled over to the side of the road. Doris testified that where Lynch pulled off the road, you had a clear view of the old gin.  Doris identified the car Lynch was driving.

¶15.    Steven testified that Zanders was his mother-in-law.  Zanders's house was approximately 15 to 20 feet from his trailer.  Steven testified that on November 15, 1995, at approximately 1:00 p.m., Kevin Scott came to his trailer.  Steven testified that he knew Scott and he pointed him out for the record.  Scott wanted a ride home.  Scott was sweating.  Scott was not wearing a jacket.  Steven testified he knew that Scott had a car and asked him why he needed a ride.  Scott told Steven that he needed a ride because his car was at home.

¶16.    On the way, Steven stated that they stopped at a store because Scott thought his father might be there.  Scott kept looking off to the left toward the gin.  There were police cars in the area.  Scott never got out of Steven's car.  Steven carried Scott to his house in Davenport.  Steven testified that he made a point of looking to see if Scott's car was at home.  His white Oldsmobile had been wrecked.  He let Scott out approximately 200 yards from his house.  On the way back home to Bobo, Steve met Lynch driving

5

a little brown car. Steven recognized the car as being Scott's brother's car.[1] Lynch was driving slow. He was headed toward Davenport.

¶17.	Steven testified that he could still see police activity down near the gin on his way back to Bobo. Police were also still at the store. He stated he saw K-9 units and flashing blue lights.

¶18.	Billy Joe Estes (Estes), chief investigator for the Bolivar County Sheriff's Department, testified that on November 15, 1995, he was involved in investigating the shooting that had occurred in Boyle, Mississippi, at the Lees' residence. He arrived at the Lees' residence around 12:30 p.m. Estes had officers, Bill Quinton (Quinton) and Murry Roark (Roark) secure the crime scene and collect evidence. Estes testified that he left looking for the Lees' white 1990 white four door Oldsmobile, tag number BDB 842.

¶19.	Estes received information over the radio from Officer Haney with Delta State Police that he had seen a car fitting the description of the Lee's car in Bobo, Mississippi. He headed toward Bobo. The car had been found at an old abandoned gin in Bobo. Units from Coahoma County were already at the scene when he arrived. K-9 units were called out of Parchman to search.

¶20.	The Lees' automobile was found abandoned on the west side of the old gin on an old turn road. The car door was open. Blood was on the car seat. A Miami Hurricane jacket, the pistol and wallet were found at the back of the old shop in the gin area. One of the K-9 units discovered the jacket. The .380 automatic pistol was found wrapped inside the jacket. Scott's driver license was discovered inside on of the pockets of the bloody jacket. There was also a letter from a girlfriend addressed to Scott and some

---

[1] Both Doris and Steven identified photographs of a car as being the car driven by Lynch that day. Steven also identified photographs of Scott's wrecked car that he saw when he dropped him off at his house.

money wrapped in the jacket. The jacket also contained an money envelope from the First National Bank with bloody fingerprints on it.

¶21.     The driver's license discovered was issued to Kevin D. Scott, 104 Davenport Road, Third Street, Clarksdale, Mississippi. Estes furnished that information to the Sheriff of Coahoma County. The Coahoma County Sheriff and some other officers left for Davenport to look for Scott. Scott was arrested by the Coahoma County Sheriff's Office between 2:00 - 2:30 p.m. on November 15, 1995. Estes brought Scott back to Cleveland from the Coahoma County Sheriff's Office.

¶22.     Estes took two statements from Scott on November 15, 1995, and Scott signed two acknowledgment of rights forms. Scott's acknowledgment of rights form, exhibit 14, had the time marked at 4:45 p.m. Scott was advised of his rights, and Estes checked off the rights and signed the form. Scott also signed the form. H. M. Mack Grimmett, Sheriff of Bolivar County, witnessed the rights being read to Scott.

¶23.     Scott was advised of his rights a second time. Scott's second acknowledgment of rights statement, exhibit 16, had the time marked as 7:05 p.m. Officer Charlie Griffin, Sheriff Grimmett, Scott's mother, Diane Scott (Diane), and stepfather, Parnell Andrews (Andrews), were present when Estes advised Scott of his rights. Scott signed the second acknowledgment. Estes again checked off the rights and signed the acknowledgment form along with two witnesses. Estes testified that Scott appeared knowledgeable and voluntarily acknowledgeable to his rights and signed the acknowledgments. No threats or promises were made to Scott.

¶24.     Scott identified himself at the first questioning. He denied knowing where Boyle, Mississippi, was and stated he had only been to Cleveland once with his mother. At the second questioning with his mother and stepfather present, Scott admitted to being in Cleveland and Boyle on November 15, 1995. He also

admitted to shooting Lee and shooting at Lee's wife, Lurline. In his statement, Scott claimed that Lee was cussing him and he got Lee's gun away from him and shot Lee and shot at Lurline. He then panicked and took the car and left.

¶25.    Andrews, Scott's stepfather, testified the photographs identified as being the car driven by Lynch on November 15, 1995, belonged to his "other son", Parnell Scott, Jr.

¶26.    Kenneth Gill (Gill), a latent print examiner with the Mississippi Crime Laboratory in Batesville, testified he compared the known ink fingerprint card taken from Kevin B. Scott, exhibit 11, to a money envelope from First National Bank, exhibit 20. Gill found fingerprints on the envelope from First National Bank using ninhydrin to enhance any latent fingerprints. One latent print of "value" was discovered. By "value," the print had enough characteristics to make an identification. When compared to Scott's ink print, there was a match to Scott's left ring fingerprint.

¶27.    Dr. Steven Hayne (Dr. Hayne), the State pathologist, testified as to Lee's injuries. Dr. Hayne stated that the cause of death was homicide from a gunshot wound to the left temple of the head. Dr. Hayne testified that based on the gunshot wound through the brain, Lee would not have been expected to remain conscious or functional for any period of time after infliction of the would. The bullet went through the cerebral hemispheres producing a gaping hole through the brain. Pressure from the bleeding did further damage to the brain.

¶28.    Debbie Haller (Haller), an employee of the Mississippi Crime Laboratory in Jackson, was qualified by the trial court as an expert in forensic serology and DNA examination. Haller collected and tested a sample from the stain on the jacket, exhibit 23, car seat corner, exhibit 34, bottom car seat, exhibit 25, baseball cap, exhibit 35, pair of brown pants, exhibit 22 and a money envelope, exhibit 20. Haller tested blood samples from Scott, exhibit 37, and Lee, exhibit 28.

8

¶29.   Dana Johnson, Mississippi Crime Laboratory in Jackson, had previously testified as the blood samples.  Johnson had been qualified by the trial court as an expert in forensic serology, the examination of body fluid stains.  On cross-examination, Haller testified that based on the seven markers used, the samples taken from exhibit 20, 22, 23, 25, 34 and 35 did not come from Scott.  However, the samples are consistent with Lee, and therefore, could have come from Lee.

¶30.   Scott raises the following claims for consideration by this Court:

I.      **WHETHER SCOTT WAS MENTALLY RETARDED SO AS TO BAR THE DEATH PENALTY.**

II.     **WHETHER SCOTT WAS DENIED HIS RIGHT TO A FAIR TRIAL WHEN THE TRIAL COURT FAILED TO HOLD A COMPETENCY HEARING.**

III.    **WHETHER THE TRIAL COURT ERRED IN FAILING TO DECLARE *SUA SPONTE* A MISTRIAL.**

IV.     **WHETHER THE TRIAL COURT'S ERROR IN STRIKING PROSPECTIVE JURORS.**

V.      **WHETHER THE TRIAL COURT ERRED IN NOT STRIKING JURORS.**

VI.     **WHETHER THE PROSECUTION IMPERMISSIBLY PUT VICTIM IMPACT EVIDENCE INTO THE JURY'S CONSIDERATION DURING THE GUILT PHASE.**

VII.    **WHETHER THE TRIAL COURT ERRED IN NOT GIVING A LESSER INCLUDED OFFENSE INSTRUCTION.**

VIII.   **WHETHER THE JURY AS THE FINDER OF FACT WAS ENTITLED TO AN INSTRUCTION PURSUANT TO *CRANE V. KENTUCKY* ON THE WEIGHT IT SHOULD AFFORD SCOTT'S CONFESSION.**

IX.     **WHETHER SCOTT WAS ENTITLED TO JURY INSTRUCTION ON EYEWITNESS IDENTIFICATION.**

X.               **WHETHER SCOTT WAS ENTITLED TO A JURY INSTRUCTION THAT FAILING TO STOP LEROY LYNCH FROM KILLING LEE WAS NOT MURDER AND CERTAINLY NOT A DEATH ELIGIBLE MURDER.**

XI.              **WHETHER VICTIM IMPACT WAS IMPERMISSIBLY INFLAMMATORY AND TOO ATTENUATED FOR PURPOSES OF MEETING EVEN DE MINIMIS DUE PROCESS.**

XII.             **WHETHER THE PROSECUTION ARGUED THAT THE JURY SHOULD FOLLOW GOD'S LAW, IN PLACE OF THE LAW OF THE UNITED STATES OF AMERICA AND THE STATE OF MISSISSIPPI.**

XIII.            **WHETHER THE PROSECUTION'S RELIANCE ON RELIGIOUS AUTHORITY AND OTHER IMPERMISSIBLE FACTORS DIMINISHED THE JURY'S SENSE OF RESPONSIBILITY FOR ITS SENTENCING DETERMINATION.**

XIV.            **WHETHER THE TRIAL COURT ERRED IN NOT GIVING A VICTIM IMPACT INSTRUCTION, DEFENSE INSTRUCTION D1A.**

XV.              **WHETHER TRIAL COURT IMPERMISSIBLY LOWERED THE BURDEN ON THE PROSECUTION BY A CONFUSING AND IMPROPER UNANIMITY INSTRUCTION.**

XVI.           **WHETHER THE TRIAL COURT ERRED BY FAILING TO GIVE AN INSTRUCTION WITH THE BURDEN OF PROOF FOR MITIGATION.**

XVII.          **WHETHER THE AGGRAVATING FACTOR, THAT THE CAPITAL OFFENSE WAS COMMITTED FOR THE PURPOSE OF AVOIDING OR PREVENTING A LAWFUL ARREST IS AGAINST THE OVERWHELMING WEIGHT OF EVIDENCE.**

XVIII.        **WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THEY COULD NOT CONSIDER SYMPATHY.**

XIX.      WHETHER THE TRIAL COURT ERRED IN ALLOWING
          THE STATE TO INTRODUCE PHOTOGRAPHS OF THE
          VICTIM.

XX.       WHETHER THE TRIAL COURT IMPERMISSIBLY
          RETURNED THE JURY TO DELIBERATE AFTER IT
          RETURNED A VERDICT LESS THAN DEATH.

XXI.      WHETHER THE PROSECUTION MISSTATED THE LAW
          TO THE JURY, INFRINGING ON SCOTT'S RIGHT TO
          HAVE HIS JURY CONSIDER MITIGATING EVIDENCE.

XXII.     WHETHER MISSISSIPPI'S STATUTE, WHICH EXCLUDES
          PROSPECTIVE JURORS WHO ARE, FOR ANY REASON,
          UNABLE TO COMPLETE A JURY QUESTIONNAIRE, IS
          UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED TO
          SCOTT.

XXIII.    WHETHER DISCRIMINATION IN PROSECUTION
          OCCURRED BASED ON THE RACE OF THE VICTIM AND
          RACE OF OFFENDER.

XXIV.     WHETHER AT LEAST ONE INVALID AGGRAVATING
          CIRCUMSTANCE WOULD REQUIRE THIS COURT TO
          REMAND FOR A NEW CAPITAL SENTENCING
          PROCEEDING.

XXV.      WHETHER ERRORS TAKEN TOGETHER ARE CAUSE
          FOR REVERSAL.

XXVI.     WHETHER THE IMPOSITION OF THE DEATH PENALTY
          WAS EXCESSIVE OR DISPROPORTIONATE IN THIS
          CASE.

## LEGAL ANALYSIS

### I. Mental Retardation

¶31.   Scott alleges that he is mentally retarded and that under *Atkins v. Virginia*, 536 U.S. 304, 122

S.Ct. 2242, 153 L.Ed.2d 335 (2002), his sentence of the death penalty is barred as prohibited by the

Eighth Amendment to the United States Constitution. The United States Supreme Court stated in *Atkins*:

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright*, with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." 477 U.S. 399, 405, 416-17, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

*Atkins*, 536 U.S. at 317, 122 S.Ct. at 2250.

¶32. The State contends that Scott bears the burden of proving he is mentally retarded. Under Mississippi law, the State does not bear the burden of proof when a question of competency arises. *See Emanuel v. State*, 412 So.2d 1187, 1188 (Miss. 1982) ("it naturally devolves upon the defendant to go forward with the evidence to show his probable incapacity to make a rational defense."). *See also Medina v. California*, 505 U.S. 437, 445, 112 S.Ct. 2572, 2577, 120 L.Ed.2d 353 (1992) (the United States Supreme Court concluded that the allocation of the burden of proof to a criminal defendant to establish does not violate his constitutional rights). The State draws the analogy to the burden of proof when a defendant claims incompetency to that of mental retardation, citing *State v. Dunn*, 831 So.2d 862, 883-85 (La. 2002) (finding that the State does not bear the burden of proof as to questions of mental retardation, it should be handled as in the same manner as questions of competency); *State v. Lott*, 779 N.E.2d 1011, 1015-16 (Ohio 2002) (applied *Medina* burden of proof analysis for competency to question of mental retardation); *Morrison v. State*, 583 S.E.2d 873, 878-79 (Ga. 2003) (Georgia statute requiring the defendant to prove by a preponderance of the evidence mental retardation, not unconstitutional).

¶33.    The United States Supreme Court noted that "[t]he statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions set forth in n. 3 supra," *Id*. at 317 n. 22, 122 S.Ct 2242, as stated below:

> The American Association of Mental Retardation (AAMR) defines mental retardation as follows: "**Mental retardation refers to substantial limitations** in present functioning.  It is characterized by significantly subaverage intellectual functioning existing concurrently with related limitations in two or more of the following applicable **adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work**.  Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).  The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is **accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B)**.  The onset must occur before age 18 years (Criterion C).  Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000).

*Atkins*, 536 U.S. at 308 n.3, 122 S.Ct. at 2245 n.3 (emphasis added).

¶34.    The argument made by Scott to support his claim of being mentally retarded is based on the testimony of Dr. Mulry Tetlow (Dr. Tetlow), that Scott had an I.Q. (intelligence quotient) of 60.[2]

---

[2]  As a footnote to Scott's brief, he notes that in 1992 at age 14 his I.Q. was tested for purposes of his unsuccessful attempt to obtain social security benefits.  The I.Q. score was 48.  Scott's own expert, Dr. Tetlow, disputed the validity of that test.  According to the evaluator who conducted the 1992 test, the I.Q. test did not yield valid results due to Scott's malingering.

In fact, Scott's own brief states that, "while the validity of the test may be suspect, the test was relied upon, in part as back up for the State's expert during the penalty phase."  However, the record does not reflect that the State's expert, Dr. Lott, relied upon the test.  The record only reflects that Dr. Lott reviewed the 1992 report.  Both Dr. Tetlow and Dr. Lott performed I.Q. tests on Scott in 1998 when Scott was age 20, and both assessed his I.Q. to be substantially higher than the 1992 report reflected. **Both Dr. Tetlow and Dr. Lott noted a lack of cooperation by Scott to produce an accurate test result.**

¶35. The trial court accepted Dr. Tetlow as a clinical psychologist and as a diagnostician. Dr. Tetlow testified that based on the Wechsler Adult Intelligence Test he administered, Scott yielded an I.Q. score of 60. However, Dr. Tetlow testified that in his opinion, Scott was functioning in a "higher probability borderline retardation rather than mentally retarded." As to the 1992 test administered to Scott for purposes of the social security application, which yielded an I.Q. of 48, Dr. Tetlow stated, "[I]t was completely inadequate that Kevin [Scott] obviously had a higher I.Q. than was measured."

¶36. On cross-examination by the State, Dr. Tetlow testified that Scott was functioning in general at the borderline range of intelligence which is 70 to 79. The State argues that borderline intellectual functioning is not mentally retarded. Borderline intellectual functioning "describes an IQ range that **is higher than that for Mental Retardation** (generally 71-84)." APA, Diagnostic and Statistical Manual of Mental Disorders Fourth Edition (hereinafter "DSM-IV") at 45 (emphasis added).

¶37. Dr. Tetlow testified that during an interview with Scott, Scott claimed that he had no memory of killing someone and all that he knew was that his mother told him that he had told her that he had hurt someone. After a heated exchange on cross-examination, Dr. Tetlow stated that Scott was probably lying to him about his memory of events. Dr. Tetlow found the most likely explanation was that Scott did remember but claimed he did not remember. During his first involvement with Scott and before administering any tests, Dr. Tetlow did not talk with any member of Scott's family or read any witness statements. The only other person Dr. Tetlow spoke with was Scott's attorney.

¶38. The State called William Cris Lott, Ph.D. (Dr. Lott), clinical psychologist and clinical director of Baptist Health Systems in Jackson, Mississippi, as an expert. Prior to being employed at Baptist Health Systems, Dr. Lott was the director of forensic outpatient service at the Mississippi State Hospital. The trial court accepted Dr. Lott as being an expert in the field of clinical and forensic psychology.

14

¶39.    Dr. Lott saw Scott in July of 1998. Dr. Lott had Scott's 1992 test, several police reports, Scott's school records and Dr. Tetlow's test report. Dr. Lott talked with Scott's mother, Diane Scott, his girlfriend, Valerie, and Deputy Roark. **Dr. Lott testified that Scott was very uncooperative, resistant to testing and gave inconsistent statements.** According to Dr. Lott, uncooperativeness could be a characteristic of malingering which is by definition grossly exaggerating or fabricating information. One reason for malingering could be for the purpose of avoiding arrest or evading prosecution and incarceration. Scott's girlfriend told Dr. Lott that Scott was reasonably well-liked at school, was not seen as an aggressive or violent person at school and was very caring and loving with their child. In his free time, Scott watched movies and played Nintendo.

¶40.    Dr. Lott observed that Scott had the word "Kevin" tattooed across his chest, and the word "psycho" with a Jason mask underneath it tattooed on his right leg.

¶41.    When questioned on cross-examination, Dr. Tetlow did not know what the term ecological validity meant. Dr. Lott testified that ecological validity basically is whether the test results are consistent with a person's behaviors, activities or abilities to provide and care for themselves. According to Dr. Lott, this also is a key component of testing an individual's capacity. Dr. Lott also administered the Wechsler Adult Intelligence Test to Scott which produced a full scale I.Q. of 73.

¶42.    Dr. Lott further stated that he generally uses the Minnesota Multiphasic Personality Inventory-II (MMPI-II), as an objective pencil and paper test that has several scales to measure malingering or faking good and faking bad. He testified that he was unable to complete the MMPI-II in this case, "because Mr. Scott was unwilling to participate."

¶43.    In his opinion concurring in part and dissenting in part in *Russell v. State*, 849 So.2d 95, 148 (Miss. 2003), Then-Presiding Justice Smith wrote "[c]learly, I.Q. alone is not determinative of

whether...any person is mentally retarded." *Id*., 849 So.2d at 150. In *Russell*, the Court accepted Justice Smith's position that in considering *Atkins*, the MMPI-II should be administered. *Id*. at 148. According to Dr. Lott, Scott refused to complete the MMPI-II.

¶44.    As alluded to by Dr. Lott's testimony and in Justice Smith's concurring in part and dissenting in part opinion in *Russell*, there is more to establishing mental retardation than a low I.Q. "[A] diagnosis of mental retardation requires more than a low I.Q. score, as inability to function adaptively in society also is necessary." *In re Holladay*, 331 F.3d 1169, 1175 n.3 (11th Cir. 2003).

¶45.    The State argues that Scott does not specifically allege how or in what areas his adaptive functioning is supposedly impaired. He only makes the general statement that "the uncontroverted testimony showed serious limitations in his adaptive skills." The State contends that this is completely inaccurate and submits that the record is replete with examples of Scott's excellent adaptive skills:

1.    The facts of this crime indicate that Scott had more than adequate adaptive skills. He premeditated the crime. He went to another town to commit the crime, in order to keep from being recognized and to avoid suspicion. Also, Scott chose to steal a car that looked identical to his car that he had wrecked on the previous day. He fled from the police. He hid evidence. He managed to find a way home from Bobo when things did not go as he had planned. After he was caught, he lied to authorities.

2.    Scott's expert, Dr. Tetlow, stated that Scott's various tales about the facts of the crime were an attempt not to get caught with what he did and not to be punished. Dr. Lott also noted that Scott attempted to avoid prosecution and/or incarceration by telling inconsistent stories to the authorities.

3.    The record reflects that Scott carried on an adult relationship with a girlfriend, and he was a good father to his child. Dr. Lott testified that Scott's girlfriend, Valerie, stated she saw Scott daily. She described him as a loving, gentle father to their child. Scott's mother, Diane, testified that Scott took care of his three-year-old child, before he got into trouble.

4.    According to Dr. Lott, Scott told him that prior to the crime, he spent his free time playing Nintendo and watching movies.

5.    Scott had a driver's license. Scott obviously possessed the ability to drive.

6.	Scott testified that his mother trusted him with money and sent him to pay bills for her.  Scott also testified that he was passing the eleventh grade at the time of the crime.

¶46.	This Court finds that the proof in this record does not support Scott's claim of being mentally retarded as to require remand to the trial court for an *Atkins* hearing.  At the time of Scott's trial in October, 1998, there existed no constitutional prohibition from executing mentally retarded criminals.  Four years later, while Scott's appeal was pending before this Court, the United States Supreme Court handed down *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held that execution of mentally retarded criminals violates the Eighth Amendment to the United States Constitution.

¶47.	In response to *Atkins*, we recently handed down *Chase v. State*, 2004 WL 1118688 (Miss. 2004), in which we set forth the criteria and procedure to be used both in applying for, and conducting, a hearing[3] for a determination of mental retardation.  For criminal defendants who file applications for post-conviction relief subsequent to *Chase*, a defendant must provide "an affidavit from at least one expert . . . who opines, to a reasonable degree of certainty, that: (1) the defendant has a combined Intelligence Quotient ("IQ") of 75 or below, and; (2) in the opinion of the expert, there is a reasonable basis to believe that, upon further testing, the defendant will be found to be mentally retarded, as defined [in the Chase opinion]." *Id.*

¶48.	For direct appeals and applications for post-conviction relief which were already pending before this Court at the time *Chase* was handed down, we have ordered a *Chase* hearing without requiring an

---

[3]The *Chase* hearing to be conducted by the trial court explores whether the defendant is mentally retarded and, thus, exempt from the death penalty.

affidavit, where the record before us reflected a qualified opinion that the defendant was mentally retarded.[4]

¶49. In the case sub judice, Scott directs us to the testimony of Dr. Tetlow, who stated that Scott had an IQ of 60. However, Dr. Tetlow did not offer any opinion that Scott was mentally retarded. Instead, he testified that Scott functioned in the range of borderline retardation which, "describes an IQ range that is higher than that for Mental Retardation (generally 71-84)." *See* APA, Diagnostic and Statistical Manual of Mental Disorders Fourth Edition.

¶50. Thus, on the record before us, Scott has not established that he is entitled to an ***Chase*** hearing. However, should Scott provide the appropriate affidavit which complies with the requirements set forth in ***Chase*** as an attachment to an application for post conviction relief, pursuant to the Mississippi Uniform Post-Conviction Collateral Relief Act, Miss. Code Ann. §§ 99-39-1 *et seq*., he could be entitled to a hearing as provided in ***Chase***.

¶51. As no qualified expert testified that Scott was mentally retarded, we find this issue to be without merit.

## II. Competency

¶52. Scott argues that the trial court erred by failing to conduct a competency hearing sua sponte following the impaneling of the jury despite his erratic behavior. During the course of the trial, Scott allegedly complained of voices in his head, tore at his skin and acted in a "deranged" manner. In addition, Scott complains that the trial court applied the incorrect legal standard to determine competency. Scott claims that being placed in solitary confinement during the beginning of the trial instead of with the general

---

[4]We found no reason to require a defendant to provide us with an affidavit which restated an opinion already contained in the record before us.

population exacerbated his competency or lack thereof, impaired his ability to aid in his own defense and

denied him a fair trial under the Mississippi Constitution and the Sixth, Eighth and Fourteenth Amendments.

¶53.    In *Snow v. State*, 800 So.2d 472, 489 (Miss. 2001), this Court held:

> The standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him."*Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

This Court in *Snow* further relied upon *Emanuel v. State*, 412 So.2d 1187, 1188-89 (Miss. 1982)

which sets forth the procedures for a competency hearing.

> When the trial court has made a finding that the evidence does not show a probability that the defendant is incapable of making a rational defense, we will not overturn that finding unless we can say, from the evidence, that the finding was manifestly against the overwhelming weight of the evidence. The evidence must show more than a possibility that defendant is incompetent to stand trial-the evidence must go further until it appears to the trial court that there is a probability that defendant is incapable of making a rational defense. In this initial inquiry, the trial judge must weigh the evidence and be the trier of the facts. *Emanuel*, 412 So.2d at 1189.

*Snow,* 800 So.2d at 490 (citing *Emanuel*, 412 So.2d at 1189). In addition, the Uniform Circuit and

County Court Rule 9.06[5] set forth the actions that a trial court must perform in matters of competency.

---

[5] UCCCR 9.06 for the competency of a defendant states the following:
If before or during trial the court, of its own motion or upon motion of an attorney, has reasonable ground to believe that the defendant is incompetent to stand trial, the court shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court in accordance with § 99-13-11 of the Mississippi Code Annotated of 1972.

After the examination the court shall conduct a hearing to determine if the defendant is competent to stand trial. After hearing all the evidence, the court shall weigh the evidence and make a determination of whether the defendant is competent to stand trial. If the court finds that the defendant is competent to stand trial, then the court shall make the finding a matter of record and the case will then proceed to trial. If the court finds that the defendant is incompetent to stand trial, then the court shall commit the defendant to the Mississippi State Hospital or other appropriate mental health facility. The order of commitment shall require that the defendant be examined and a written report be furnished to the court every four calendar months, stating:

A.       Whether there is a substantial probability that the defendant will become mentally competent to stand trial within the foreseeable future; and

B.       Whether progress toward that goal is being made.

The defendant's attorney, as the defendant's representative, shall not waive any hearing authorized by this rule, but is authorized to consent, on behalf of the defendant, to necessary surgical

¶54. On October 16, 1998, the trial court issued an order concerning Scott's competency to stand trial. According to the order Scott previously filed a notice of a special plea of incompetency to stand trial on June 9, 1998. Part of the notice included a psychological report performed by Dr. Tetlow.

¶55. Dr. Tetlow's conclusion, at that time, was that Scott was unable to assist his attorney with his defense but with time and treatment Scott may be able to assist his attorney. The report was dated March 12, 1998. Thereafter, the trial court conducted a hearing on June 19, 1998, ordering a mental examination and a supplemental order followed requiring a mental examination on July 16, 1998, by Dr. Lott, a psychologist, as to Scott's competency to stand trial. On July 29, 1998, the trial court received Dr. Lott's report.

¶56. Dr. Lott concluded that Scott did have the capacity to confer with his attorney, understand the proceedings against him, assist his attorney, appreciate the criminality of the actions, understand and knowingly and intelligently waive or assert his rights, and that he was not suffering from a mental illness at the time of the acts. Considering Dr. Lott's report and the other evidence before him, the trial judge ruled that Scott was mentally competent to stand trial.

---

or medical treatment and procedures. If at any time during such commitment, the court decides, after a hearing, that the defendant is competent to stand trial, it shall enter its order so finding and declaring the defendant competent to stand trial, after which the court shall proceed to trial.

If at any time during such commitment, the proper official at the Mississippi State Hospital or other appropriate mental health facility shall consider that the defendant is competent to stand trial, such official shall promptly notify the court of that effect in writing, and place the defendant in the custody of the sheriff. The court shall then proceed to conduct a hearing on the competency of the defendant to stand trial. If the court finds the defendant is not competent to stand trial, it shall order the defendant committed as provided above. If the court finds the defendant is competent to stand trial, then the case shall proceed to trial.

If within a reasonable period of time after commitment under the provisions of this rule, there is neither a determination that there is substantial probability that the defendant will become mentally competent to stand trial nor progress toward that goal, the judge shall order that civil proceedings as provided in §§ 41-21-61 to 41-21-107 of the Mississippi Code of 1972 be instituted. Said proceedings shall proceed notwithstanding that the defendant has criminal charges pending against him/her. The defendant shall remain in custody until determination of the civil proceedings.

¶57.    It is from these events and ruling that the trial began on October 19, 1998. The first day of trial, however, the trial court addressed defense counsel's request to cross-examine Dr. Lott. The trial judge also gave a synopsis of the events leading to trial and stated:

> The Court is now entertaining a matter regarding the defendant's competence to stand trial. Let me say at the onset that back in May, or thereabouts, defense counsel stated that he would not be entering a plea of insanity, but he thereafter did file a motion entitled "Special Plea of Incompetency to Stand Trial." Mr. Wong submitted to the Court a report of a Dr. Tetlow out of New Orleans, Louisiana....

> The Court conducted a hearing and thereafter ordered additional reports in order - a report from Dr. Lott, who's here from the State of Mississippi. And after receiving all of the evaluations and reports, etcetera, the Court entered an order after not having received a request from either the District Attorney of [sic] defense counsel for a further hearing on this matter. It is my understanding that Mr. Wong [defense counsel] wishes in some way to - and at some point to cross-examine Dr. Lott.

Defense counsel asked for a follow-up hearing on the matter on October 16, 1998. The trial court heard arguments and ruled:

> All right. Well, again, the Court insists that **there has been a competency hearing**, and the Court recognizes that Dr. Lott was not here for purposes of cross-examination. **But to act out of an abundance of caution, when Dr. Lott does arise, Mr. Wong - does arrive, Mr. Wong the Court will allow you, in some manner, to question; that is cross-examine Dr. Lott, and this matter will be reconsidered.** The competency decision that the Court has made based on information already available to the Court will incorporate that cross-examination into the record, it will consider it along with other matters that Court has before it, to make the determination as to whether the defendant is competent to stand trial.

> I cannot defer this trial....

(emphasis added).

¶58.    Voir dire commenced and indeed the proceedings were stopped a number of times and discussions occurred in the judge's chambers concerning Scott's behavior. Each time the record reflects that the trial judge had discussions in chambers with Scott present.

21

¶59.    When voir dire was completed and testimony began, the trial court noted Scott's improved behavior on the record and outside the presence of the jury.  Later, when a witness testified concerning Scott's confession, Scott interrupted the proceedings.  The trial judge had discussions in his chambers and outside the presence of the jury.  During this time, Scott complained to the trial court that his problem was the fact that he was in solitary confinement.  The trial court ordered Scott taken out of solitary confinement.  Scott's attorney noted Scott's improvement the next morning.  Indeed, the trial judge later stated on the record:

> The defendant informed the Court informally that the basis for his problem was the place where he had slept the night - or nights before did not lend itself to his maintaining his composure during the course of the day.  He asked to be put in the general population; that is, among other inmates in this jail facility here at the Bolivar County Jail in Cleveland.
>
> And the Court asked the sheriff to facilitate the defendant's request.

The record contains references to occasions where Scott conferred with his attorney during the trial.

¶60.    On October 23, 1998, the trial court  had another competency hearing and heard testimony from Dr. Tetlow and Dr. Lott.  **Dr. Tetlow changed his earlier opinion and stated that Scott could stand trial**.  Likewise, Dr. Lott stated that the new information did not change his finding that Scott could stand trial.  The trial court ruled:

| The Court: | We're still in chambers outside the presence of the jury.  And the defendant, his attorney and the prosecuting attorneys are all present. |
|---|---|
| | The Court has entertained reports - has previously entertained reports regarding defendant's competency to stand trial; and this morning the Court entertained additional evidence by way of testimony of both Dr. Tetlow and Dr. Lott. |
| | The Court took a recess to reflect on what its ruling would be, and the Court has prepared its ruling, which it is now about to make.  Heretofore, an issue arose as to the defendant's competence to stand trial to thereby assist his attorney with his defense. |

22

At the request of defense counsel, the Honorable Raymond Wong, the defendant was allowed to submit to mental examination with Dr. L. Mulry Tetlow.  A report of that examination was provided to the Court.  A competency hearing was held, but no decision was made at that time.

The court, on its own motion, ordered that the defendant be further examined by Dr. William Chris Lott.  After receiving that report, the Court found the defendant to be competent to stand trial.  But on a day prior to trial, one workday before trial defense counsel asked to exercise the defendant's right to cross-examine Dr. Lott.

The Court responded by saying that the defendant may exercise that right, but the trial shall proceed as scheduled on October 19, 1998, that it wold be sometime during the course of the trial before Dr. Lott could and would arrive, and upon his arrival in court, Mr. Wong could cross-examine him; Dr. Lott, before the trial was completed.

Now, pursuant to the Uniform Circuit and County Court rule 9.06, a competency hearing was again held this morning, October 23rd, 1998, wherein both Dr. Tetlow and Dr. Lott testified as to the defendant's competence.

Dr. Tetlow stated that, as he reported previously, the defendant could not adequately assist counsel with his defense on the date of the report in March of 1998, but in time, he may become able to do so; that it is his present opinion that the defendant is competent to stand trial and assist his counsel with his defense.

Dr. Lott testified that it is his opinion that the defendant is competent to stand trial and assist his counsel with his defense.

**After hearing all the evidence, including medical reports, testimony, etcetera on the defendant's competence to stand trial as of October 19th, 1998, and after observing the defendant's demeanor for and during the course of the trial, the Court has weighed the evidence and does hereby make the determination that the defendant was competent to assist his counsel and stand trial on October 19th, 1998, and that he remains competent in those regards.**

(emphasis added).

¶61.    We find that a review of the record shows a discrepancy with Scott's assertions that there was no

competency hearing following the impaneling of the jury.  First, the record shows that Scott had two

competency hearings, one before trial and one before the State rested its case-in-chief.  In the first hearing,

the trial court made a determination that  Scott was competent before trial was set to begin.  The second

hearing was conducted during the trial.  The trial court relied in part upon the testimony of both Scott's

expert, Dr. Tetlow, and the State's expert, Dr. Lott, that he was competent to stand trial.  Therefore,

Scott's assertion that the trial court failed to hold a competency hearing is a misstatement of the record.

¶62.    As to whether the trial court applied the correct standard of review, this Court finds that this issue

was not raised during the trial.  Indeed, the trial court gave an extensive order concerning Scott's

competency before trial.  Some of the specifics of the order are cited above.  Then, at trial a second

competency hearing was conducted on October 23, 1998.  The trial court gave a detailed on the record

ruling which is also cited above and in compliance with UCCCR 9.06.  The rule requires that a hearing

be conducted after an examination is performed and that the trial court, considering all the evidence, makes

a determination as to competency and places the findings in the record.  This was done by the trial judge

as evidence by the ruling cited above.  In fact, the trial judge referenced Rule 9.06 in his decision.   We

cannot say that the ruling was manifestly against the overwhelming weight of the evidence.  The trial judge

considered such things as: expert testimony, Scott's behavior, and medical reports.  This issue is also

without merit.

¶63.    Scott also claims that being placed in solitary confinement was unconstitutional and interfered with

his right to trial.  This Court finds that the defense never raised this issue during trial and is therefore

procedurally barred from raising it on appeal.  "[H]eightened appellate scrutiny in death penalty cases does

not require abandonment of our contemporaneous objection rule which applies with equal force to death

24

cases. For many years this Court has held that trial errors cannot be raised in this Court for the first time on appeal." *Williams v. State*, 684 So.2d 1179, 1203 (Miss. 1996). "If no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case." *Cole v. State*, 525 So.2d 365, 368 (Miss. 1988) (citations omitted).

¶64. While he did not raise at trial that his solitary confinement was unconstitutional, Scott did express to the trial court outside the presence of the jury that his behavior was caused by being held in solitary confinement. Once Scott expressed his concerns to the trial court, he was removed from solitary confinement. Two experts testified as to Scott's competency. In conclusion, we find that there is ample evidence to support that Scott was competent to stand trial. Also, as to Scott's claim on appeal that being in solitary confinement affected his ability to prepare for trial, this Court finds that it is without merit.

### III. Opening Statement

¶65. Scott contends that his trial counsel admitted to the charge and aggravating factor of robbery, therefore, de facto, pleaded him guilty in the opening statement. Based on the alleged admission Scott argues that the trial judge should have sua sponte declared a mistrial. Scott's trial counsel, R. L. Wong (Wong), is also Scott's counsel on appeal making this argument. In effect, Wong is making an ineffective assistance of counsel argument that he sabotaged Scott's trial without raising ineffective assistance of counsel as an issue. Wong does not cite any authority to support an ineffective assistance argument.

¶66. The record reflects the following opening statement:

> [W]hat we expect the evidence to show is that Mr. Scott was at Mr. and Mrs. Lee's house in Boyle on the 15th of November, 1995, at about, say a little before noon. **What we expect the evidence to show is that Mr. Scott stayed in the car.** And this car that we're talking about that he came to Cleveland in was a two-door gold Chrysler Lager automobile, which was his brother's car.

25

At that time, while they were in the driveway of Mr. Lee's home, Mr. Lynch got out. **Unbeknown to my client, Mr. Lynch had a pistol, which was, I think, a .380 automatic.**

There is a distance from the beginning of the driveway to the garage. The house faces -- is on Lee Avenue and faces north. The garage isn't built into the side of the house, it goes, and you have to drive into the side. It is on the east side of the house. The view from the -- where the driveway begins and to the garage you cannot see because of this turning in at right angles.

**As Mr. Scott was listening to the music, he heard some shots, he got out. He walked toward the garage. When he walked toward the garage, he saw Mr. Lynch coming back towards him**.

He gave him a gun, which was the .380, he gave him a baseball cap, and he gave him the keys to Mr. Lee's car, **and he told him to go get the car**. As he was going toward the garage, unknowing what happened at that time, and as he turned in, **Mr. Lynch had gotten into the two-door gold Lager automobile and had driven off. Mr. Scott was now at Mr. Lee's residence. Mr. Lee is now lying on the ground**.

**He did not know anyone. Being scared, he got into the white Oldsmobile car and left, and then drove north on Highway 61**.

**The evidence will show that Mr. Scott did not know what was going to happen at Mr. Lee's residence.** When he found out about the gun was when Mr. Lynch gave it to him and told him to get rid of it. And he went and -- to get the car.

The evidence will show that he knows [sic] Leroy Lynch for some period of time. The evidence will show that as he left and went to Bobo, he did put his coat -- and I think his wallet was in there -- under a -- an abandoned building. I think also the .380 automatic pistol was there, too.

The evidence will show that he took the baseball cap with him. The evidence will also show that he went back to Davenport. He got a ride from, I think, a Mr. Ivy, after asking Ms. Ivy in Bobo for a ride. The evidence will show that Mr. Lynch wore a baseball cap. The evidence will show that this baseball cap was turned over to the Sheriff's department by Ms. Diane Scott, the mother.

The evidence will show that my client did not shoot at Mrs. Lee at her home. The evidence will show that my client did not shoot and kill Mr. Richard [Lee]. The evidence will show that he was arrested approximately on the same day or a few hours later.

Evidence will show that two statements were given to the Bolivar County Sheriff's Department. The evidence will show that the first statement was not true, that he had never been to Cleveland. The second statement, that he -- that he had shot and killed Mr. Lee, is also not true.

The evidence will show why did he -- would he confess or make a statement that he had committed the crime. Mr. -- the evidence will show that un- -- or that Mr. Scott believed Mr. Lynch when he said, "We won't get into any trouble," that "You are young, they won't come after you. Just keep me out of it." And that's the reason why he told the police that.

26

The evidence will show that he did not commit the crime of capital murder and the crime of aggravated assault.

(emphasis added).

¶67. At trial, the version of facts testified to by Scott on his direct examination placed blame on Lynch for bringing the gun, going to the Lee's residence, shooting Lee, and shooting at Lurline. According to Scott, Lynch left him at the Lee's residence with the keys to lee's car and with not other way to leave. The defense's opening statement is virtually identical to the testimony later provided by Scott at trial. The record reflects the following exchange:

| | |
|---|---|
| Defense [Wong]: | Mr. Scott, I want to call your attention back to November the 15th of 1995 in the Davenport area. It's the morning of the 15th. When did you and Leroy Lynch get together? About what time? |
| Scott: | Well, about 9:00 or something like that. |
| Defense: | In the morning? |
| Scott: | Yes. |
| Defense: | All right. And what was the purpose for you and Mr. Lynch getting together? |
| Scott: | That early morning, I had got some money from my mother. And she had told me to pay some bills and stuff. Just before I had came out the door, he had called me and told me to come pick him up. |
| Defense: | All right. And was that in a First National Bank envelope? |
| Scott: | Yes. |
| Defense: | Some cash money? |
| Scott: | Yes. |
| Defense: | All right. And did you have a coat on? |
| Scott: | Yes. |
| Defense: | What kind of coat was it? |
| Scott: | Miami. |
| Defense: | I beg your pardon? A University of Miami coat? |
| Scott: | Yes. |
| Defense: | All right. I think it was orange, green, and white? |
| Scott: | Yes. |
| Defense: | Did you have any type of cap on? |
| Scott: | No. |
| Defense: | And where did you pick up Mr. Lynch? |
| Scott: | He told me to come pick him up at the project. |

| | |
|---|---|
| Defense: | All right. Now, what kind of car were you driving then? |
| Scott: | A little gold-colored car.... |
| Defense: | You picked up Mr. Lynch in the gold car at the projects. What did ya'll do then? |
| Scott: | At first, I had paid some bills before I had when and picked him up. And then, I picked him up. Then he asked me to take him to Cleveland.... |
| Defense: | [W]here was your coat? |
| Scott: | On the armrest in the car.... |
| Defense: | Who was wearing the black baseball cap? |
| Scott: | He had on the cap once he came out of the house. |
| Defense: | Whose house? His house? |
| Scott: | His house it was.... |
| Defense: | Whose idea was it to come -- to come to Cleveland? |
| Scott: | His idea. I didn't ask no questions, because he's my friend or whatever.... And then, after the gas was pumped or whatever, he asked me to drive. So I came around the passenger's side of the car and laid the seat all the way back, and he drove the car down to Cleveland.... |
| Defense: | And who had the Miami Hurricane Coat? |
| Scott: | He had it on.... |
| Defense: | He didn't take it off after he got through pumping gas, you know.... [Y]ou said Leroy was driving the car to Cleveland? |
| Scott: | Yes. |
| Defense: | What happened when ya'll got to Cleveland? |
| Scott: | He came to Jitney Jungle's. And while I had my seat still laid back, he parked, got out of the car, went in the store for about two to three minutes, I guess, and then he came back and got in the car.... I was still laying down in the seat, so -- he came back and got in the car and then got back on the highway.... |
| Defense: | And did he ever stop anywhere else? |
| Scott: | No.... |
| Defense: | Did he stop the car at Mr. Lee's house? |
| Scott: | After we came from there -- |
| Defense: | Was that Jitney Jungle? |
| Scott: | Yes.... He got back on the highway. I could hardly see, noway, you know, because I had my seat laid down. So the car had pulled up to a stop again, so at that time, whatever, he got out of the car.... |
| Defense: | Now, when he got out of the -- |
| Scott: | At -- |
| Defense: | Go ahead. |
| Scott: | Mr. Lee's house.... That was the other time he had stopped.... |

| | |
|---|---|
| Defense: | When he got out of the car, what were you doing? |
| Scott: | Still laid back in the seat playing with the radio.... |
| Defense: | What happened after -- where you were at, could you see the inside of the garage? |
| Scott: | No. I -- like, the driveway was right here.... And then the garage was, like, around that way. And how he had it parked, it was close to the road there.... |
| Defense: | Now, after you heard the shots, what did you do then? |
| Scott: | I jumped up out of the seat, opened the door, came around the car.... |
| Defense: | And where were you going? |
| Scott: | To see what was going on.... |
| Defense: | And were you headed toward the garage? |
| Scott: | Yes, I was about two or three steps in front of the car.... |
| Defense: | And that's the gold car, right? |
| Scott: | Yes. |
| Defense: | What happened when you were in front of the gold car?... |
| Scott: | Leroy came back out of the garage way.... Ran out of the garage way, and then he seen me and started pacing, like, really slow.... |
| Defense: | [W]hat happened then? |
| Scott: | He seen me, he came to a pace, and then he started taking off my coat, then he gave me his hat. He took off the coat, right, and put it in my hand, then he took off his hat, put it on top of my coat. Then he had some keys in his hand. |
| Defense: | All right. And were you told by someone to get the car? |
| Scott: | Yes. After he gave me all that stuff, he said, "Get in the car," just like that.... So at that point, I didn't know what was going on, really. I heard some shots, so I was going to go and see what was going on, but -- so he gave me all that stuff and was walking back towards the car, so I had -- |
| Defense: | Who was walking back towards the car? Which car? |
| Scott: | Leroy was walking back towards the gold car.... |
| Defense: | And where were you headed? |
| Scott: | I was, like, at the – coming up to the corner of the garage. |
| Defense: | All right. |
| Scott: | And then I had seen Mr. Lee laying on the ground.... And then I was just shocked, I guess, because when I -- then I turned back -- turned back and looked to see where he was at or whatever. |
| Defense: | When you're talking about "he," who are you talking about? |
| Scott: | I looked back to see where Leroy was at or whatever. He had hopped in my car and left. He pulled off real fast. |
| Defense: | What did you do then? |
| Scott: | After I looked back? |

| | |
|---|---|
| Defense: | Yeah. |
| Scott: | The car was pulling off. And then I was still shocked from seeing Mr. Lee laying there on the ground.... |
| Defense: | Did you shoot Mr. Lee? |
| Scott: | No. |
| Defense: | Did you ever shoot at Mrs. Lee? |
| Scott: | No. I didn't do none of that. |
| Defense: | After you were panicked and you were there by yourself, what did you do then? |
| Scott: | I had throwed all the stuff he had gave me back, and then -- |
| Defense: | Where did -- where did you put it? |
| Scott: | After all that had went on or whatever, I had -- because the car door was still open on Lee's car.... His car door was open, so after all that had went on or whatever, I had throwed everything he gave me in the car, plus the keys that to -- he had gave me, too. |
| Defense: | At that time, did you know that -- did you ever know before this shooting that Leroy Lynch had a pistol -- or a gun? |
| Scott: | No, I didn't know he had no pistol. That's how come I had hopped out of the car and stuff, because I heard some shots. |
| Defense: | And did he also give you the pistol? Did Leroy also give you the pistol? |
| Scott: | Inside the pocket.... Inside the coat pocket. |
| Defense: | What happened after you got into Mr. Lee's car. |
| Scott: | I had took the keys off the hat, because he put the keys on top of the hat he gave me, too. I put them in the switch and left. |

¶68.    Scott's testimony confirmed the defense's statements made in the opening remark. Scott cannot testify to his account of the facts on one hand and then also raise on appeal that his case should be reversed because his counsel gave the same facts as a preview of what the evidence would show. This argument is illogical.

¶69.    This Court finds that the defense's opening statement is not inconsistent with the testimony provided by Scott, himself, on direct examination. Therefore, this issue is wholly without merit and unsupported by the record.

## IV.  Prospective Juror 57

¶70.    Scott argues that the trial court erred in striking jurors who stated in the abstract that they opposed the death penalty but stated they could follow the law.  The only juror that Scott alleged was improperly struck was Juror 57, Alma Wallace.  The State contends that no objection was made by the defense, therefore procedurally barring the issue.  The record contains an extensive individual voir dire on the State's challenge as to Juror 57 being stricken for cause.  The record reflects the following exchange transpired:

The Court:    Ms. Wallace, did you indicate to us on yesterday that you are opposed to the death penalty?

Juror 57:    Yes, I did.

The Court:    Since you tell me you are, would the fact that your sitting on the jury involving potential consideration of the death sentence, would that in any way hinder you in reaching a verdict on the guilt phase or affect your ability to vote guilty or not guilty in the guilty phase.

Juror 57:    No.

The Court:    It wouldn't?

Juror 57:    No.

The Court:    If you're a member of the jury that return a verdict of guilty of capital murder in the guilt phase, would you automatically vote against the death penalty, even if the facts justify the death penalty beyond a reasonable doubt, and the law given to you by the Court allowed the death penalty to be returned by unanimous vote of the jury?

Juror 57:    Right.

The Court:    You're saying you would not automatically vote against the death penalty or you would automatically vote against the death penalty?

Juror 57:    I wouldn't automatically vote against it.

The Court:    What are some of the things you would take into consideration before you would vote one way or the other?

Juror 57:    Just the evidence, I guess....

The Court:    The jury, on which you sit, has already under this analogy, reached a verdict of guilty.  Now Mr. Mellen [State] has put on facts and circumstances showing why the death penalty should be imposed.  Mr. Wong [Defense] will then have an opportunity to put on evidence to show why the death penalty should not be imposed.  Now, could you made up your mind -- would you make up your mind only after they have put on this evidence, or just because you're against the death penalty, you would vote against the death penalty regardless?

Juror 57:    I'd wait until after.

31

| | |
|---|---|
| The Court: | Okay. You will wait until after. You'll sit objectively, in a fair and impartial manner, and listen to both sides. If the facts justified it and the law allow it, could you then vote to impose death? |
| Juror 57: | Yes. |
| The Court: | And if the mitigating circumstances outweigh the aggravating circumstances, could you vote for life without parole? |
| Juror 57: | Yes.... |
| State: | **What did you mean when you said that you are against the death penalty?** |
| Juror 57: | **I just don't believe that I could really vote for it.** |
| State: | Okay. So in no circumstance would you vote for it because of your beliefs? |
| Juror 57: | Would I vote for the -- |
| State: | For the death. |
| Juror 57: | Just because of my beliefs? |
| State: | Yeah. |
| Juror 57: | No. |
| State: | **Are you saying you could not vote for death?** |
| Juror 57: | **I could vote for it, but it -- really.** |
| State: | Okay. Do you fell like you could not vote for the death sentence on somebody right now? |
| Juror 57: | Well. |
| State: | You're not sure? |
| Juror 57: | No. |
| State: | You know, the Judge asked those question. Did you understand that when he was talking about weighing and all that? |
| Juror 57: | I understand it, but I don't really get it. |
| State: | Well, it's difficult. I mean, we understand that. That's the only thing, maybe, we understand. But when the -- when the jury decides, if they give the penalty of -- or find him guilty of capital murder, then the jury has to decide if he gets death or not. And just simply from the evidence, from those things to justify the death penalty and then those things that would justify not giving death is a weighing for the jury. And some jurors simply cannot give death; just say they're against it. Some say they could follow the law and would do the weighing process. How do you feel, that you could not -- |
| Juror 57: | I don't think I could do that. |
| State: | That's all. |
| The Court: | Mr. Wong. |
| Defense: | Ms. Wallace, let me see if I can try to clarify. You have -- your opinion is, you are against the death penalty; is that correct? |
| Juror 57: | Yes. |

32

| | |
|---|---|
| Defense: | All right. But what is required if you are seated as a penalty phase juror, is that you must follow the law that's given to you by the Court, even though you have an opinion against the death penalty. Do you understand that? |
| Juror 57: | Uh-huh (affirmative response). |
| Defense: | You have to answer for her. |
| Juror 57: | Yes, sir. |
| Defense: | What the Court is asking you, is that you are sitting in the penalty phase. |
| Juror 57: | Uh-huh (affirmative response). |
| Defense: | You will follow the law as given to you by the Court in making your determination of life or death based on the aggravating circumstances that are presented to you and the mitigating circumstances that are given to you. From that, you must decide which weighs more. And for the -- from that, you will make a decision whether life or death is the appropriate penalty. Do you understand that? |
| Juror 57: | Yes. |
| Defense: | And it will require you to put aside you opinion about the death penalty and follow the law of the case -- in the penalty phase. And the question is, could you do that? **Even if -- even when the facts justify and the law allows it, could you impose the death penalty? That is the question.** |
| Juror 57: | **I don't -- I don't think I can.** |
| Defense: | All right. |
| The Court: | Thank you very much. |
| | (JUROR 57 EXCUSED FROM CHAMBERS.) |

(emphasis added).

¶71. The State submits that Juror 57 concluded that she could not impose the death penalty, and at a minimum, she definitely equivocated back and forth. Based on the record this Court agrees. This Court has examined the proper standard for exclusion of a juror in death penalty cases under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as follows:

> In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court attempted to clarify the *Witherspoon* juror exclusion standard in death penalty cases. *See Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The proper standard it as follows:
>
> > is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and

33

his oath." We note that, in addition to dispensing with Witherspoon's reference to "automatic" decision making, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of catechism. ... many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.... there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.... deference must be paid to the trial judge who sees and hears the juror.

*Wainwright*, 469 U.S. at 424-25, 105 S.Ct. at 852-53, 83 L.Ed.2d at 851-53; *Pinkney v. State*, 538 So.2d 329, 345 (Miss. 1988) (judgment vacated and case remanded in light of *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990));*Lockett v. State*, 517 So.2d 1317, 1335 (Miss. 1987);*Fuselier v. State*, 468 So.2d 45, 53-54 (Miss. 1985).

However, jurors who oppose the death penalty or believe it unjust, may serve as jurors in capital cases "so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 S.Ct. 1758, 1766, 90 L.Ed.2d 137, 149-50 (1986); *Hansen v. State*, 592 So.2d 114, 128 (Miss. 1991).

*Balfour v. State*, 598 So.2d 731, 755 (Miss. 1992) (quoting *Wainwright*, 469 U.S. at 424-25, 1055 S.Ct. at 852-53).

¶72. In *Manning v. State*, 726 So.2d 1152, 1886-87 (Miss. 1998), this Court was faced with a factually similar situation. Manning was convicted in the Circuit Court of Oktibbeha County, Mississippi, on two counts of capital murder while engaged in commission of a robbery and was sentenced to death. *Id*. at 1152-53. Manning argued that potential juror, Chanteau Bowens, was excluded for cause in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In *Manning*, the Court stated:

Manning argues that it is clear from the record that Bowens was able to consider the death penalty, and that her statements concerning the imposition of it were unequivocal. This contention is not supported by the record. On her jury questionnaire Bowens stated that she could never vote to impose the death penalty. **On individual voir dire, Bowens equivocated back and forth.** She first said that she could give the death penalty if it was due. She also said that at the beginning of the sentencing phase she would be favoring life over death. Then, she again stated that if the evidence warranted it, she could give the death penalty. Next, she said that given the two options, she would have to choose life over death. Then, one more time, she said that she could vote for the death penalty....

It is clear from a reading of the record that Bowens was excused, over defense objection, because of her equivocation on the death penalty.... Affording the appropriate deference to the trial judge who saw and heard Bowens, we cannot say that he abused his discretion.

*Manning*, 726 So.2d at 1186-87 (emphasis added).

¶73. This Court has held that the trial judge has "wide discretion in determining whether to excuse any prospective juror, including one challenged for cause." *King v. State*, 784 So.2d 884, 887 (Miss. 2001). A trial judge does not commit reversible error by excusing for cause a prospective juror "who gave contradictory responses, wavered on their position, and generally appeared confused regarding the death penalty issue." *Id.* at 888 (citing *Dufour v. State*, 453 So.2d 337, 341-45 (Miss. 1984)).

¶74. This Court finds that this issue is without merit. Clearly, Juror 57 went back and forth on the death penalty issue. In fact, the record reflects that the last response given by Juror 57 was "I don't think I can," when asked for the last time if she could impose the death penalty. Therefore, we find that after conducting an individual voir dire of Juror 57, the trial court did not err in striking Juror 57 for cause.

### V. Whether the trial court erred by striking prospective jurors

¶75. Scott next argues that the trial court erred by not striking jurors 7, 15, 68 and 74. According to Scott these four jurors stated that they could not conform their conduct to the law and would automatically return a verdict of death. Scott claims that the jurors should be excluded pursuant to *Witherspoon v.*

*Illinois*, 391 U.S. 510 (1968) and its progeny. He claims that counsel was denied a meaningful opportunity to ask substantive questions (i.e., their view of the death penalty) of the venire panel.

¶76.   This Court finds that none of these four jurors actually served as part of the jury. Scott struck jurors 7, 15, and 68 as part of his peremptory challenges. The record reflects that the defense exercised its peremptory strikes as follows: D-1 struck juror 7, D-3 struck juror 15, and the alternate strike DA-3 struck juror 68. As for juror 74, the last possible juror seated was alternate juror 71, therefore, juror 74 was not even considered for jury service. The record reflects the prosecution, clarifying the alternates for the jury, stated to the trial court "[a]nd the alternates, Your Honor, that will be 59, 62, 69 and 71." The trial court then immediately stated "All right. We'll impanel the jury without swearing them in and release the other jurors for the week...." Thus, juror 74 was not part of the impaneled jury.

¶77.   Notwithstanding that none of the jurors in question were part of the impaneled jury, all of these jurors stated that they could set aside there opinions and follow the law in the case. The trial court posed the following questions with the juror answers:

The Court:             All right. Now let me ask you my ultimate questions. If you're a member of the jury that returns a verdict of guilty of capital murder in the guilt phase, part one, would you automatically vote for the death penalty, even if the mitigating facts and circumstances justified a life sentence, and the law given to you by the Court allowed a life sentence to be returned by the jury? Would you automatically vote death, or would you enter in to this weighing process, weighing the aggravating factors against the mitigating factors? Could you follow the law and first do this weighing thing?

(JURORS RESPOND IN THE AFFIRMATIVE)

The Court:             Can anybody not do that?

(NO RESPONSE FROM THE JURORS)

36

| | |
|---|---|
| The Court: | If you can find, if you can't find, I just want to know. |
| Juror No. 7: | I can. |
| Juror No. 68: | I can. |
| Juror No. 15: | I can. |
| Juror No. 74: | I don't know whether I can, because it's kind of a toss up there. They've already presented the facts and they're just reviewing the facts again. |

After some further discussions with juror 74 on the process, the juror stated that he could consider aggravating and mitigating factors before making a decision on whether the defendant should receive the death penalty. Following the trial courts questions, the prosecution and defense conducted individual voir dire on these four jurors. The prosecution asked generally if the jurors could consider all the evidence and consider mitigating and aggravating factors before making a decision. The defense then individually voir dired each juror. Each juror indicated that they would not automatically impose the death penalty without first considering and weighing the mitigating and aggravating factors. At the conclusion of this questioning by the trial court, the prosecution and the defense, the trial court ruled:

> Okay. The court finds that after the Court further advised the - - these four jurors and after they, therefore, became more informed, they were, in fact, rehabilitated, and they shall not be stricken for cause.

¶78. This Court in *Simmons v. State*, 805 So.2d 452, 503 (Miss. 2001), considered an issue similar to Scott's complaint raised on appeal. In *Simmons*, this Court first addressed the fact that Simmons had not used all his peremptory challenges and none of the jurors actually sat on his jury.

> Our settled rule requires that, before an appellant may challenge a trial court's refusal to excuse a juror for cause, he must show that he utilized all of his peremptory challenges.

*Simmons*, 805 So.2d at 503 (citing *Hansen v. State*, 592 So.2d 114, 129 (Miss. 1991)). The Court also considered the jurors statements that they could follow the law and put aside their personal views on the death penalty. The Court stated:

37

Further, each juror testified that they could put aside their personal views about the death penalty and follow the law in regard to Simmons' case. **It appears that, by this admission, they rehabilitated themselves.** This language of "putting aside" personal beliefs was approved in the following passage of *Leatherwood v. State*:

> The two veniremen, Robert Nations and Mary Garrett, indicated that they had strong views in favor of the death penalty. After the court overruled appellant's challenge to the jurors, appellant used two of his peremptory challenges to strike them. We have carefully considered the questions propounded to and responses of Nations and Garrett and are of the opinion that the trial court's ruling was in full compliance with *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). When questioned by counsel both jurors said that they could put aside their personal feelings, follow the law and instructions of the court and return a verdict based solely upon the law and the evidence and not vote for the death penalty unless the evidence warranted it.

*Leatherwood v. State*, 435 So.2d 645, 654 (Miss.1983). The trial court cannot be said to have erred by following this language.

*Simmons*, 805 So.2d at 503 (emphasis added). Simmons also complained about individualized voir dire for prospective jurors that were in favor of the death penalty, to which this Court held:

> [V]oir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.' *Ballenger v. State*, 667 So.2d 1242, 1250 (Miss.1995). This Court has directed the trial court to take a substantial role in conducting *Witherspoon* voir dire of potential jurors in capital cases. *Ballenger*, 667 So.2d at 1250. There is no error here.

*Simmons*, 805 So.2d at 503.

¶79. This Court finds that the trial court did not err by denying strikes for cause on jurors 7, 15, 68, and 74. The prospective jurors all stated that they could follow the law and weigh the evidence and mitigating and aggravating factors before making a determination of whether Scott should receive the death penalty. The record is full of questions from the trial court, the State, and the defense concerning the death penalty. The four jurors in question also appeared in the trial judge's chambers and were questioned more extensively by the trial court, prosecution and defense. The record reflects that the defense individually questioned each of the four jurors in chambers. The trial judge placed no restrictions on the attorneys'

38

questions in chambers. Lastly, we find that none of the jurors ever sat on the final impaneled jury, and thus, never even voted on the issue of Scott's guilt or whether he should receive a death or life sentence. This Court finds that this issue is without merit.

## VI. Victim Impact Evidence - Guilt Phase

¶80.    On appeal, Scott argues that the trial court erred in allowing the prosecution to admit what Scott alleges to be victim impact evidence from Lurline's testimony during the guilt phase. Scott contends that the testimony was irrelevant and inadmissible during the guilt phase. Scott focuses only on the following testimony from Lurline on direct examination by the State:

| | |
|---|---|
| State: | And, Mrs. Lee, you live where? |
| Lurline: | 305 Lee Street, Boyle, Mississippi. |
| State: | And for how long have you lived there? |
| Lurline: | Seven years. |
| State: | And who bought that house? |
| Lurline: | My husband and I. |
| State: | And that would be who? |
| Lurline: | Richard Lee, the deceased. |
| State: | Mrs. Lee, how long were you and Richard Lee married? |
| Lurline: | Almost 52 years, lacking a month and four days. |
| State: | And was he employed? |
| Lurline: | He had been retired for about 10 or 11 years. |
| State: | I call your attention to 1995 on November 15. Were you living, you and Richard, in that house in Boyle at that time? |
| Lurline: | Yes, we were. |
| State: | And you and he were retired. Can you tell us what you did, if anything, or what kind of activities you were engaged in? |
| Lurline: | Fishing and hunting. |
| State: | Enjoying retirement? |
| Lurline: | Enjoying retirement. |
| State: | And on this particular day, can you tell us if there was anything that you particularly were going to be doing? |
| Lurline: | Yes. Richard went to town for last-minute shopping before we would go to my daughter, Sandra Dixon's house, and we were going to deer hunt. We had a camp there. |

¶81. The trial record reflects that during the testimony solicited by the State from Lurline the defense did not object to any question or any of the testimony. Furthermore, as Scott did not raise any objection at trial to the line of questioning or testimony, this Court finds that this issue is now procedurally barred from being raised for the first time on appeal. *See Williams v. State*, 684 So.2d at 1203 (contemporaneous objection rule is applicable in death penalty cases). Alternatively, without waiving any procedural bar, the State argues the testimony was not "victim impact" testimony. *See Crawford v. State*, 716 So.2d 1028, 1046 (Miss. 1998) (overruled on other grounds) ("Victim impact statements are those which describe the victim's personal characteristics, the emotional effect of the crimes on the victim's family, and the family's opinion of the crimes and the defendant."). The State contends that Lurline's testimony was that of one of the victim's regarding the circumstances of the crime: (1) the location of the home; (2) the fact that they were retired and were at home; and (3) the purpose of Lee's trip to town that day. The testimony pinpointed the location of the crime, the witness's relationship to the victim, why the witness was at the location of the crime and the actions of the victim the day of the crime.

¶82. This Court finds that the testimony was not "victim impact" testimony. Lurline's testimony was presented as a witness and a victim of the charged crimes. Her testimony was solicited to explained the circumstances surrounding the crime and established guilt. Moreover, Scott's lack of objection in the record to contest the testimony from Lurline acts now to procedurally bar this issue on appeal.

## VII. Lesser Included Offense Instruction of Murder

¶83. Scott briefly argues that the trial court erred by denying an instruction on the lesser-included offense of murder. Scott states generally "[t]he evidence supported a lesser included jury instruction" without providing any specific facts or evidence in the record to support such a statement.

¶84. The record does not reflect that Scott offered a written lesser-included offense of murder instruction to the trial court. Also, Scott does not cite to any such written instruction in the record. Scott cites the following generic authority in support of his argument:

> A lesser included instruction is appropriate where a lesser offense is identified within the charged offense and a rational jury could find the defendant guilty of the lesser offense but not guilty of the greater one. ***Beck v. Alabama***, 447 U.S. 625 (1980). The lesser offense must not include all of the elements of the greater offense. ***Sansone v. United States***, 380 U.S. 343, 349-50 (1965). It cannot include an additional element to those in the greater offense. It is "identified" within the greater offense only if it is "necessarily presented as part of the showing of the greater offense, and both crimes relate to the protection of the same interests." E.g., ***United States v. Raborn***, 575 F.2d 688, 691 (9th Cir. 1978). The lesser included offense instruction must be given if it is requested and is appropriate to the case. E.g., ***Keeble v. United States***, 412 U.S. 205, 208 (1973).

¶85. The trial court conducted a hearing prior to the conclusion of the State's case-in-chief where the State requested to withdraw its pre-filed murder instruction. The State argued that the instruction should be withdrawn, as "there being no showing here that it [Lee's murder] was anything other than a killing during the course of robbery." Scott's counsel did not request a murder instruction. However, the defense stated its objection to withdrawing the State's instruction before the defense presented its portion of the trial. The defense also stated the lesser-included instruction should be granted only if the evidence warrants it. The trial court deferred consideration until the conclusion of all the evidence.

¶86. Even though Scott had not offered a written jury instruction, the trial court did consider Scott's request for a lesser-included instruction of murder and the State's request to withdraw the lesser-included instruction it had pre-filed with the clerk's office. The following exchanged occurred on the record:

> The Court:    Now, Mr. Wong, we come back to your lesser included instruction involving murder.
> Defense:    Your Honor, if there is no robbery by my client but he's involved in the homicide, then that would make it a murder case. We would think that a lesser included instruction regarding murder is warranted.

41

| | |
|---|---|
| The Court: | Give me the factual basis for it. Your client admitted he got into the car and drive it off. |
| Defense: | But he did not take it against the will of Mr. Lee. The Court -- there's not -- the Court -- the jury may find, based on what the jury will believe or not believe, that he was involved in the homicide but not the robbery. If that is the situation, then he would be guilty of murder. It would state that the lesser included offense of murder also be submitted to the jury. |
| The Court: | Is your client contending that he had permission to take it or implied permission to take it? |
| Defense: | No, sir, but the basis is what will the jury believe, which they can believe or disbelieve anything they want. If they disbelieve the robbery portion of it, then we have a homicide, which is -- in that case, would be murder. |
| The Court: | Let me hear from the State. |
| State: | Your Honor, I would say there, that in *Bail v. Watkins*, which is 692 Federal Second, 999, it says when the defendant admits committing the underlying offense, but denies committing the murder, no proof exist sufficient to grant a lesser included offense instruction of simple murder. That's in point. |
| The Court: | All right. |

¶87.    In *Presley v. State*, 321 So.2d 309, 310 (Miss. 1975), this Court said:

[T]he jury should not be instructed as to a lesser-included offense in such a way as to ignore the primary charge as this would be confusing to the jury. It is also true that if the evidence does not justify submission of a lesser-included offense, the court should refuse to do so. Unwarranted submission of a lesser offense is an invitation to the jury to disregard the law.

*See Grace v. State*, 375 So.2d 419, 420 (Miss. 1979).

¶88.    The Court further stated that:

[L]esser-included offense instructions should be given if there is an evidentiary basis in the record that would permit a jury rationally to find the defendant guilty of the lesser offense and to acquit him of the greater offense." *Hobson v. State*, 730 So.2d 20, 26 (Miss. 1998) (quoting *Welch v. State*, 566 So.2d 680, 684 (Miss. 1990)).

*Mitchell v. State*, 792 So.2d 192, 218 (Miss. 2001).

¶89.    Therefore, evidence must be presented at trial to support the trial court granting a lesser-included

instruction on murder. *See Edwards v. State*, 737 So.2d 275, 310-11 (Miss. 1999); *Turner v. State*,

732 So.2d 937, 948-50 (Miss. 1999); *Bell v. State*, 725 So.2d 836, 854 (Miss. 1998); *Evans v.*

*State*, 725 So.2d 613, 664-66 (Miss. 1997); *Conner v. State*, 632 So.2d 1239, 1253-55 (Miss. 1993) (overruled on other grounds).

¶90.    The evidence presented at trial, including Scott's own testimony, established that he took Lee's automobile.  The evidence also established that Lee was murdered.  If Scott was involved in Lee's murder, as the jury determined, the taking of Lee's automobile was by definition robbery.  Miss. Code Ann. § 97-3-73 defines robbery as follows:

> Every person who shall feloniously take the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in  fear of some immediate injury to his person, shall be guilty of robbery.

¶91.    This Court finds that the evidence presented in the case does not support a reasonable jury finding Scott guilty of murder rather than capital murder.  Granting a jury  on the lesser-included offense of murder was not warranted under the facts presented.  We find that the trial court did not err in denying Scott's request for a jury instruction on the lesser-included offense of murder.

## VIII, IX & X.  Proposed Jury Instructions: D-2, D-3, D-4

¶92.    This Court has repeatedly reiterated the standard of appellate review applicable to questions of denial of jury instructions as follows:

> When considering a challenge to a jury instruction on appeal, we do not review jury instructions in isolation; rather, we read them as a whole to determine if the jury was properly instructed. *Burton ex rel. Bradford v. Barnett*, 615 So.2d 580, 583 (Miss. 1993).  Similarly, this Court has stated that "[i]n determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole.  When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Coleman v. State*, 697 So.2d 777, 782 (Miss. 1997) (quoting *Collins v. State*, 691 So.2d 918 (Miss. 1997)).  In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results.

*Milano v. State*, 790 So.2d 179, 184 (Miss. 2001).  *See Austin v. State*, 784 So.2d 186, 193 (Miss.

2001).  *See also Agnew v. State*, 783 So.2d 699, 701 (Miss. 2001).

### A.  Proposed Instruction D-2

¶93.    Scott briefly contends that the trial court erred in denying proposed instruction D-2, which stated:

> The Court instructs the jury that a confession is not conclusive and may be of little weight
> or of great weight or of no weight according to the circumstances of this case; the
> determination of weight to be accorded a confession is for the jury to determine.

¶94.    After a discussion on the record, the trial court denied the instruction finding that it was included

in the court's instruction, C1.  The trial court's instruction C1 states in pertinent part:

> You are not to single out one instruction alone as stating the law, but you must
> consider there instructions as a whole.
>       **It is your exclusive province to determine the facts in this case and
> consider and weigh the evidence for that purpose.**  The authority thus vested in
> you is not an arbitrary power but must be exercised with sincere judgment, sound
> discretion and in accordance with the rules of law stated to you by the court.
>       Both the State of Mississippi and the defendant(s) have a right to expect that you
> will conscientiously consider and weigh the evidence and apply the law of the case and that
> you will reach a jury verdict regardless of what the consequences of such verdict may be....
>       As sole judges of the facts in this case, **your exclusive province is to
> determine what weight and what credibility will be assigned the
> testimony and supporting evidence of each witness in this case.**  You are
> required and expected to use your good common sense and sound honest judgment in
> considering and weighing the testimony of each witness who was testified in this case.

(emphasis added).

¶95.    The record indicates the following exchange:

> The Court:    Mr. Mellon [State], your response to D-2....
> State:        [W]e don't agree to that instruction.  I don't know where he gets this....
>               [H]e's commenting on evidence there.
> The Court:    (Court reads instruction.)  Mr. Wong, where is that coming from?
> Defense:      *Diddlemeyer versus State*,...  234 Southern Second 292, a
>               Mississippi 1970 case.  Wilson v. State, 451 Southern Second, 724 a
>               Mississippi 1984 case.  Here is *Diddlemeyer*.

State:      If that's -- if that's not a comment on the evidence, I don't know what would be.

The Court:      Mr. Wong [Defense] what is that really saying? In the absence of that instruction, wouldn't it be up to the jury, anyway.

Defense:      Well, how do they know what standard to apply?

State:      Judge, may I see C-1, your instruction C-1? And can I respond to your question, even though you did address that to Mr. Wong?...

State:      You say in C-1, "As sole judges of the facts in the case, your exclusive judges province is to determine what weight....

Defense:      [A]nd credibility will be assigned to the testimony and supporting evidence of the witnesses in this case." And this is another instruction, and it singles out some testimony concerning the confession. I just really don't -- have never heard of something that would go to that. Did he confess? Is accepting these as confessions of capital murder?...

Defense:      Your Honor, Mr. Mellen put on Mr. Estes, who stated that ... Mr. Scott stated that he shot Mr. Lee and he shot as Ms. Lurline Lee.

The Court:      [D]oes the defendant conceive that he confessed.

Defense:      No, sir, but that is just what it is....

The Court:      Wee, he can't confess and not confess at the same time, is what he's pointing out. Now, did he confess or not?

Defense:      Based on the legal definition of confession -- based on Mr. Estes' statement that Mr. Scott had supposedly give, that is a legal definition of confession.

The Court:      So there is a concession that he confessed.

Defense:      Under the legal definition.... But, we have this supposedly confession made by Mr. Scott, given to an officer. The jury may think this is conclusive, but it is not. That's what the law says. This is for them to determine. He may, for example, be a true confession of all the elements of the crime, but it tells the jury what weight it is to apply to the confession: Great weight, little weight, or no weight, without telling the jury this is not conclusive of anything.

State:      Can I get an instruction, Judge, that a witness which the defense is calling, that that testimony is not conclusive and may not be given any weight? Can I get an instruction for every defense witness that testifies? Absolutely not. And that's what this is doing, is singling out one aspect of the case.... I think that that paragraph, which is coming out of the C-1 instruction, is a all-encompassing, so far as an instruction to the jury. This is an instruction given by the Court to tell the jury how to do this. And when you start singling out certain aspects of the case and give separate instructions on that, then that's where the errors come in.

The Court:      Well the Court rules that Mr. Wong is entitled to single out. But the singling out is limited to your closing argument. C-1, I agree, is all-encompassing. It says the jury shall determine the weight and credibility.

45

|          |                                                                                 |
|----------|---------------------------------------------------------------------------------|
|          | And you can single out that part about the confession and say it applies even to the confession. |
| Defense: | All right. But, Your Honor, there's also the Court's instruction that the attorneys arguments are to help refresh your memory, and you can give it any weight or no weight that you want. |
| The Court: | That's true.... But there is a law that says you cannot otherwise single out, too. |
| Defense: | Yes, sir. I understand that. |
| The Court: | And there's another that says instructions should not be redundant, repetitive, superfluous. |
| Defense: | But I don't think this is redundant or superfluous because it does not tell them the law on confessions. |
| State: | Raymond, if you're quoting *Wilson versus State*, 451 7-24 -- |
| Defense: | Yeah. |
| State: | This only says that the Court makes a determination as to the admissibility, and the jury determines the weight and credibility. |
| Defense: | That's right. That's the support for doing that. That's a now later case. |
| The Court: | But C-1 tells them they determine the weight and credibility. And that would be telling them all over again, would it not? |
| Defense: | Well, that -- we have just proposed that instruction for the Court. |
| The Court: | All right. You come up with a good one. And if it would not redundant, it would have a lot of merit. It's not wrong. It's not improper. But it's all-encompassed in C-1, the Court finds and rules. |
| Defense: | And denies? |
| The Court: | Denies. |
| Defense: | Okay. |

¶96.    In support of instruction D-2, Scott cites ***Crane v. Kentucky***, 476 U.S. 683, 106 S.Ct. 2142,

90 L.Ed.2d 636 (1986) on appeal, but not at trial, and also ***Wilson v. State***, 451 So.2d 724 (Miss.

1984).   In ***Crane***, the United States Supreme Court concluded that circumstances surrounding a

confession cannot be excluded as evidence when the confession is admitted. ***Crane***, 476 U.S. at 690-91,

106 S.Ct. at 2147.  On appeal, Scott quotes in his brief from ***Wilson***, as follows:

> The **admissibility of a confession** ... **is to be distinguished** from the issue of its **credibility and its weight** ... '[T]he **competency of a confession as evidence is for the court to decide as a matter of law, while the weight and credibility of a confession is for the jury to decide** along with other testimony and physical evidence...'

> Once a confession is admitted into evidence, a defendant is entitle to submit evidence and have the jury pass upon the factual issues of its truth and voluntariness and upon its weight and credibility ... [T]he jury may concluded that the confession, though found by the court to be voluntary, is untrue and not entitled to any weight ... Confessions are not conclusive and may be weighed as to their credibility under the circumstances by the jury. This is a matter for the jury and not the court.

*Wilson v. State*, 451 So.2d at 726 (emphasis added). In *Wilson*, the Court defined the roles of the trial court judge and the jury when a confession is admitted. *Id*. The Court held that the trial court judge is to determine the voluntariness of a confession or its admissibility, and the jury is to determine the weight and credibility to assign to a confession. *Id*. However, this Court did not require in *Wilson* that separate instruction on the weight and credibility to be afforded when a confession is admitted. *Id*. In the case sub judice, the trial court's instruction C-1 adequately instructed the jury on its role as the sole judge of the weight and credibility to assign to all testimony and evidence presented.

¶97.   This Court finds that the jury was properly instructed. Scott cites no authority to merit reversal.

## B.   Proposed Instruction D-4

¶98.   Scott contends that the trial court erred by allowing instruction D-4, which stated:

> The Court instructs the Jury that in reaching your verdict you are to consider all of the evidence concerning the entire case and the circumstances surrounding the crime. One of the issues in this case is the identification of Kevin Scott as the perpetrator of the crime. As with each element of the crime charged, the State has the burden of proving identity beyond a reasonable doubt, and before you may convict Kevin Scott, you must be satisfied beyond a reasonable doubt of the accuracy of the identification of Kevin Scott. If, after considering all of the evidence concerning the crime and the witness' identification of Kevin Scott as the person who committed the crime, you are not convinced beyond a reasonable doubt that he is the person who committed the crime, then you must find him not guilty.
>
> Identification testimony is an expression or belief or impression by the witness. You must judge its value and reliability from the totality of the circumstances surrounding the crime and the subsequent identification. In appraising the identification testimony of a witness, you should consider the following:

> 1) Did the witness have an adequate opportunity to observe the offender?
> 2) Did the witness observe the defender with an adequate degree of attention?
> 3) Did the witness provide an accurate description of the offender after the crime?
> 4) How certain is the witness of the identification?
> 5) How much time passed between the crime and the identification?
>
> If, after examining all of the testimony and the evidence, you have a reasonable doubt that Kevin Scott was the person who committed the crime, then you find Kevin Scott not guilty.

¶99. Scott argues that the instruction was necessary because "the case hinges on whether Mrs. Lee's identification was correct..." Scott ignores all the other evidence presented at trial against Scott including his confession, the DNA evidence, possession of items that belonged to Lee and items recovered that were covered in Lee's DNA. Scott focuses solely on Lurline's eyewitness identification. Scott cites ***Davis v. State***, 568 So.2d 277 (Miss. 1990) and ***Warren v. State***, 709 So.2d 415 (Miss. 1998), in support of his position.

¶100. In ***Davis***, this Court stated that the identification instruction offered could have been granted. ***Davis***, 568 So.2d at 280-81. The Court did not state that Davis's instruction was required to be given just because their existed eyewitness identification. *See **id***. However, this Court determined that where only a part of an identification instruction was granted, Davis was not prejudiced by the deletion. ***Id***. The Court held that there was no adverse affect on Davis's case because Davis's guilt was established beyond a reasonable doubt by the overwhelming weight of evidence. ***Id***. at 281.

¶101. The defense also cited ***Warren*** on appeal and at trial. In ***Warren***, this Court found that trial court's failure to instruct the jury on the law of identification was reversible error. ***Warren***, 709 So.2d at 421. However, the facts in ***Warren*** and the facts here are clearly distinguishable. The Court in ***Warren***

determined that the identification instruction should have been allowed because the "case turned on the identification of Warren by a **single person**." *Id*. at 421 (emphasis added).

¶102. Here, the record reflects that the trial court conducted an extensive eight-page examination of the defense's request for the identification instruction, D-4. The trial court concluded that the case against Scott was not based solely on the testimony of one eyewitness. Therefore, *Warren* is not applicable to the case at hand.

¶103. Scott gave a confession when arrested that he killed Lee and shot at Lurline; Officer Estes testified as to Scott's confession at trial; Scott testified that he took the Lee's automobile; Lee's DNA was found on among other things, Scott's jacket, money envelop, the Lee's automobile; witnesses established that after Scott admitted abandoning the Lee's automobile, he sought and received a ride home rather than going to the police. The evidence also reflects that Scott had wrecked his white 1988 Oldsmobile Sierra the day before he ended up taking Lee's white 1990 Oldsmobile Sierra. Clearly, Lurline's identification was only part of the evidence introduced against Scott. In fact, Scott was taken into custody based on the bloody jacket and driver's license found near Lee's abandoned automobile, not Lurline's eyewitness identification.

¶104. In further support of its position, the State cites *Francis v. State*, 791 So.2d 904, 908-09 (Miss. Ct. App. 2001) and *Thomas v. State*, 766 So.2d 809, 811 (Miss. Ct. App. 2000), in support of its position that the instruction offered by Scott on identification was not required.

¶105. In *Francis*, the Mississippi Court of Appeals determined that *Warren* was not applicable to require an identification instruction because the identification did not rest solely on the testimony of one eyewitness, Wilkes. *Francis*, 791 So.2d at 908. The court stated that Francis disclosed to Lt. Walker where the gun used to commit the robbery had been hidden and led the police to that location. *Id*. Therefore, the court determined no error existed in not allowing the identification instruction. *Id*. at 908-09.

¶106. In **Thomas**, the Mississippi Court of Appeals addressed our holding in **Warren**, stating:

> The Mississippi Supreme Court has held that the failure to give an identification instruction, upon request, is reversible error where the identification of the accused rests entirely upon the testimony of a single witness. *See* **Warren v. State**, 709 So.2d 415, 420 (Miss. 1998).... Mrs. McQuillan's testimony was not the sole evidentiary basis upon which the identification of Thomas rested. Thomas's location near the crash sight of the stolen vehicle and his flight from law enforcement officers provided independent evidence of his involvement in the crimes.

766 So.2d at 811.

¶107. This Court finds that Scott does not establish that instruction D-4 was required given the other evidence introduced against him. The case against Scott did not rest solely on the testimony of a single eyewitness. This issue does not merit reversal.

### C.    Proposed Jury Instruction D-3

¶108. Scott contends that the trial court erred in not granting proposed instruction D-3 which stated as follows:

> The Court instructs the jury that some degree of participation in a criminal act must be shown in order to establish liability, and proof that one has stood by at the commission of a crime without taking [sic] steps to prevent it does not alone indicate participation or combination in the wrong done, although he approves the act.

¶109. Scott based his proposed instruction on **Cochran v. State**, 191 Miss. 273, 276, 2 So.2d 822, 823 (1941). However, this case is clearly distinguishable from the circumstances in **Cochran**. In **Cochran**, the Sheriff of Attala County found beer and slot machines in a dance hall. **Id**. at 822. When the sheriff found beer and slot machines, he went outside to make an arrest. **Id**. The defendant was arrested outside the premises. **Id**. After the arrest, the sheriff conducted a search upon the defendant's person, finding two concealed bottles of whiskey. The defendant was prosecuted and convicted on the possession of whiskey. **Id**. at 822-23. "The sheriff had no warrant for the arrest of appellant, and it is

50

admitted that the officer had no probably cause at the time which would authorize the arrest for the possession of the whiskey." *Id*. at 823. The Court considered whether the arrest was authorized for the possession of the beer or slot machines. *Id*. The defendant was merely standing outside the premises as a bystander when the arrest occurred. The Court, quoting *Harper v. State*, 83 Miss. 402, 415, 35 So.2d 573 (1904), stated that "some degree of participation in the criminal act must be shown in order to establish any criminal liability." *Id*. As the arrest on the possession of beer and slot machines was not proper, the evidence of the concealed whiskey was not admissible. *Id*.

¶110. In *Branning v. State*, 215 Miss. 223, 229, 60 So.2d 633, 634 (1952), a drugstore in Brooksville, Noxubee County, Mississippi, was burglarized. *Id*. at 633. The defendant was suspected of committing the burglary solely because he had been in the drugstore the day before the night the burglary was committed. *Id*. The Sheriff of Noxubee County traveled to Columbus, Lowndes County, Mississippi, to arrest the defendant. *Id*. The defendant was arrested, and without a warrant, a small box containing five morphine tablets was taken from the ashtray in the defendant's automobile. *Id*. Based on this evidence, the defendant was convicted. *Id*. The defendant objected to use of the evidence of his possession of the morphine. *Id*. at 634. On appeal, this Court, citing *Cochran*, reversed the conviction. *Id*. at 634, 637. The Court stated, "[i]n the case at bar, the most that is shown is that appellant was in the drugstore some time during the day prior to the commission of the crime the night following." *Id*. at 634. The Court further concluded that "as a matter of logic and common sense" there was not reasonable grounds to believe that the defendant "committed the burglary simply and alone because he, along with others, was seen in the store during the day prior to the night the store was burglarized." *Id*. at 636-37.

51

¶111.   In *Davis v. State*, 409 F.2d 1095, 1100 (5th Cir. 1969), the Fifth Circuit cited to this Court's

holding in *Cochran*.  Davis involved a bank robbery that occurred in Hickory Flat, Mississippi.  *Id*. at

1096.  The defendant was caught in the act of burglarizing the bank.  *Id*. at 1098.  The defendant's clothing

revealed, after FBI analysis, debris that matched debris on the bank's floor at the point where the bank had

been entered.  *Id.* at 1098.  In affirming the conviction, the Fifth Circuit held:

> In *Cochran v. State*, 191 Miss. 273, 276, 2 So.2d 822, 823, a case where an
> arrest was made on direct information that the person arrested was present, and wherein
> nevertheless the arrest was held to have been unlawful, for the reason that 'some degree
> of participation in the criminal act must be shown in order to establish any criminal liability.
> Proof that one (was present or) has stood by at the commission of a crime without taking
> any steps to prevent it does not alone indicate such participation or combination in the
> wrong done as to show criminal liability, although he approves of the act'.
>
> Two years earlier, in *Leflore v. State*, 197 Miss. 337, 22 So.2d 368 (1945) ...
> the Mississippi Supreme Court read the other side of the coin.  There a dead body,
> obviously dispatched by violent means, was found by the roadside.  The sheriff was
> notified.  He followed a trail of blood, broken twigs, and disturbed grass up to where it
> stopped at the home of the defendant.  He there discovered that the yard had recently
> been throughly swept; there was blood near the front steps covered with ashes; there was
> a smouldering fire wherein clothing had been burned; and there were blood stained blocks
> concealed in a hollow tree.  The Supreme Court held that probably cause existed for the
> arrest of the defendant without a warrant.
>
> In the case now before us it is not to be doubted that Mr. Ash and the other
> officers had credible information that the bank was being burglarized.  Moreover, from
> what he observed with his own senses Mr. Ash had good reason to believe that Davis was
> one of those engaged in the felony.  The arrest without a warrant was perfectly lawful.
>
> This being true, the officers acted within their lawful authority in removing the
> clothing of the defendant and subjecting it to laboratory analysis.  The results were
> admissible in evidence, *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d
> 782 (1967)....
>
> The evidence was more than sufficient to establish that Davis aided and abetted
> the others in the commission of the bank burglary.  It has long been settled that the acts of
> all participants in the commission of a crime are admissible against the others even though
> no conspiracy is charged.  *United States v. Messina*, 2 Cir. 1968, 388 F.2d 393, 394;
> *United States v. Sears*, 7 Cir. 1964, 332 F.2d 199, 201 (photograph of automobiles
> and other objects used in the commission of a robbery and a sack dropped by one of the
> robbers.).

*Davis*, 409 F.2d at 1100.

¶112. ***Cochran*** and subsequent cases that have been discussed this Court's holding in ***Cochran***, have all involved the question of whether probable cause existed to warrant arrest. Here, the record clearly reflects evidence of Scott's participation in the criminal acts. Scott testified that he took Lee's automobile. His fingerprints were found in the automobile. Lee's blood and DNA were found in the automobile, on Scott's jacket, among other things recovered. Scott gave a confession that he killed Lee and shot at Lee's wife, Lurline. Scott had wrecked his 1988 Oldsmobile, which was similar to Lee's 1990 Oldsmobile, the day before. Lurline identified Scott as the person who shot and killed her husband and shot at her on November 15, 1995. Obviously, this case is distinguishable from ***Cochran***.

¶113. Therefore, we find that the trial court did not err in not granting Scott's proposed instruction D-3. Sufficient evidence of Scott's participation renders this issue without merit.

## XI. Victim Impact Evidence - Sentencing Phase

¶114. Scott contends that the trial court permitted improper use of victim impact evidence. However, as the State correctly points out, Scott never identifies what evidence he considered improper. Also, nothing in Scott's brief makes any reference to alleged improper testimony.[6] Without specific evidence or objection to consider, this Court finds that this issue is not properly before this Court. M.R.A.P. 28 (a)(6) provides that:

---

[6] While not waiving any procedural bar, the State does speculate that Scott may have been referring to Lee's wife's testimony during the sentencing phase. Only two witnesses testified for the State during the sentencing phase. Scott had specifically referenced alleged victim impact evidence from Lurline in the guilt phase in Issue VI. However, Scott does not name Lurline in this issue. Lurline's testimony, which was considerably brief, was the only testimony presented by the State regarding Lee's personal history. The defense did not pose any questions on cross-examination to Lurline. The record further reflects that Scott did not object to any of the questions posed to Lurline or her responses.

The argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes and parts of the record relied on.

¶115. In *Conley v. State*, 790 So.2d 773, 784 (Miss. 2001), Conley was convicted of capital murder in the Circuit Court of Pike County. On appeal, Conley alleged that the trial court erred in not allowing a full cross-examination of the State's witness. *Id*. The Court did not find any basis for the issue, stating:

Pursuant to M.R.A.P 28 (a)(6), this issue is not properly before the Court. Conley has failed to cite any specific instance in the record where the trial court limited his cross-examination....

*Id*.

¶116. We find that this issue is procedurally barred for failure to allege any specific error for this Court to consider.

## XII & XIII.   Prosecutor's Closing Arguments - Sentencing Phase

¶117. In his twelfth and thirteenth issues, which will be combined, Scott contends that the State impermissibly made reference from the Bible, to God and God's law. Scott argues that reference to the Almighty crossed the line. In his brief, Scott does not discuss or distinguish the line of cases where this Court has repeatedly held that comments to scriptural, religious or biblical references are proper in closing arguments. *See Berry v. State*, 703 So.2d 269, 281 (Miss. 1997); *Carr v. State*, 655 So.2d 824, 853 (Miss. 1995). Furthermore, Scott does not address the State's closing remarks that the jurors were to follow the instructions given by the trial court, explaining the instructions and application of the law to the instructions.

¶118. The State contends that this issue is not properly before this Court for consideration. A review of the record reveals that Scott never objected to the statements made by the State on close. Accordingly, this Court finds that we need not address issues that are not objected to and preserved for appeal.

¶119.	In *Wells v. State*, 698 So.2d 497, 514 (Miss. 1997), this Court determined that the defendant was procedurally barred from raising allegations of improper comment by the State in its closing arguments for the first time on appeal, stating:

> A review of the record reveals that no objection was raised to these comments at trial and it is raised for the first time on this appeal. Any claim is waived for failure to raise a contemporaneous objection. *Ballenger v.State*, 667 So.2d 1242, 1272 (Miss. 1995), *cert. denied*, _____ U.S. _____, 116 S.Ct. 2565, 135 L.Ed.2d 1082 (1996); *Davis v. State*, 660 So.2d 1228, 1245 (Miss. 1995), *cert. denied*, ____ U.S. ____, 116 S.Ct. 1684, 134 L.Ed.2d 785 (1996); *Chase v. State*, 645 So.2d 829, 854 (Miss. 1994), *cert. denied*, 515 U.S. 123, 115 S.Ct. 2279, 132 L.Ed.2d 282 (1995);*Hansen v. State*, 592 So.2d 114, 139-40 (Miss. 1991), *cert. denied*, 504 U.S. 921, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992).

¶120.	In *Williams v. State*, 684 So.2d at 1192, the Court determined that Williams's assignment of error, on appeal, was procedurally barred where the alleged error was raised for the first time on appeal. Despite the fact that *Williams* was a death penatly case, the Court found that the issue was procedurally barred for failure to make a contemporaneous objection at trial in order to preserve the issue on appeal. *Id*. In *Cole v. State*, 525 So.2d 365, 368 (Miss. 1988), which was cited by the Court in *Williams*, the defendant argued that his rights had been violated by comments made by the prosecution. The Court held:

> Counsel may not sit idly by making no protest as objectionable evidence is admitted, and then raise the issue for the first time on appeal. If no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case. *Irving v. State*, 498 So.2d 305 (Miss. 1986), *cert denied*, ____ U.S. ____, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); *Johnson v. State*, 477 So.2d 196 (Miss. 1985), *cert. denied*, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986); *In re Hill*, 460 So.2d 792 (Miss. 1984);*Hill v. State*, 432 So.2d 427 (Miss.), *cert. denied*, 464 U.S. 977, 104 S.Ct. 414, 78 L.Ed.2d 352 (1983).

¶121.	Based on the lack of any objection in the record to any comments by the State in its closing argument and based on the prior holdings of this Court, this Court finds that this issue is procedurally barred.

55

## XIV. Proposed Instruction D-1A

¶122. Scott argues that the trial court erred in denying proposed sentencing instruction D-1A, which provided:

> The prosecution has introduced what is known as victim impact evidence. Victim impact evidence is not the same as evidence of a statutory aggravating circumstance. Introduction of victim impact does not relieve the state of its burden to prove beyond a reasonable doubt the existence of a statutory aggravating circumstance. This evidence is simply another method of informing your [sic] about the harm caused by the crime in question. To the extent that you find that his evidence reflects on the defendant's culpability you may consider it, but you may not use it as a substitute for proof beyond a reasonable doubt of the existence of a statutory aggravating circumstance.

¶123. Without providing any specific authority, Scott contends that "if the jury has received victim impact evidence, and the defendant requests the jury to be instructed on their use of such evidence, an instruction should be given." Scott further states that "at best such a lack of instruction is vague as to how the jury is to use the evidence." The authority relied on by Scott in support of his vagueness argument is *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S.Ct. 1853, 1957, 100 L.Ed.2d 372 (1988) ("[C]laims of vagueness directed at aggravating circumstances defined in capital punishment statutes ... characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty.") and *Espinosa v. Florida*, 505 U.S. 1079, 1081, 112 S.Ct. 2926, 2928, 120 L.Ed.2d 854 (1992) ("Our cases ... establish that an aggravating circumstance is invalid ... if its description is so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor.").

¶124. The trial court gave jury instruction S-1A which instructed the jury as to the aggravating factors and how to apply the aggravating factors. Furthermore, Instruction S-2A was given by the trial court which instructed the jury to weight the aggravating and mitigating factors in sentencing. Instruction S-1A provided:

56

You have found the Defendant, Kevin B. Scott, guilty of the crime of capital murder. You must now decide whether the defendant will be sentenced to death or life imprisonment without parole. In reaching your decision, you may objectively consider the detailed circumstances of the offense for which the defendant was convicted, and the character and record of the defendant himself. You should consider and weigh and aggravating and mitigating circumstances, as set forth later in this instruction, **but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling**.

A.

To return the death penalty in this case you must first unanimously find from the evidence beyond a reasonable doubt that one or more of the following facts existed:

1.   That the defendant actually killed Richard Lee.
2.   That the defendant attempted to kill Richard Lee.
3.   That the defendant intended the killing of Richard Lee take place or;
4.   That the defendant contemplated that lethal force would be employed.

B.

To return the death penalty you must find that the mitigating circumstances -- those which tend to warrant the less severe penalty of life imprisonment without parole -- do not outweigh the aggravating circumstances -- those which tend to warrant the death penalty.

**Consider only the following elements of aggravation in determining whether the death penalty should be imposed:**

**(1)   whether the capital offense was committed for the purposed of avoiding or preventing a lawful arrest,**
**(2)   whether the capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of robbery.**

You must unanimously find, beyond a reasonable doubt, that one or more of the preceding aggravating circumstances exists in this case to return the death penalty. If none of these aggravating circumstances are found to exist, the death penalty may not be imposed, and you shall write the following verdict on a sheet of paper:

"We the jury, find the defendant should be sentenced to life imprisonment without parole."

57

If one or more of the above aggravating circumstances is found to exist beyond a reasonable doubt, then you must consider whether there are mitigating circumstances which outweigh the aggravating circumstance (s). Consider the following elements of mitigation in determining whether the death penalty should be imposed:

(1)     any matter, any other aspect of the defendant's character or record, any other circumstance of the offense brought to you during the trial of this cause which you, the jury, deem to be mitigating on behalf of the defendant.

If you find from the evidence that one or more of the preceding elements of mitigating exists, then you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death sentence.

(emphasis added).

¶125. Instruction S-2A, provides:

The Court instructs the jury that it must be emphasized that the procedure that you must follow is not a mere counting process of a certain number of aggravating circumstances versus the number of mitigating circumstances. Rather, you must apply your reasoned judgment as to whether this situation calls for life imprisonment without parole, or whether it requires the imposition of death, in light of the totality of the circumstances present.

¶126. This Court finds that there was nothing vague in instruction S-1A given by the trial court. The jury was properly instructed as to what it could consider as an aggravating factor in this case.

¶127. As the State argues, Scott's proposed instruction D-1A requests the trial court to provide an instruction on the weight to be given to particular evidence, notably Lurline's testimony. The trial court should not grant instructions that do not provide a correct statement of law or provides improper comment on the weight to be given to particular evidence. *See Austin v. State*, 784 So.2d 186, 193 (Miss. 2001)("Issues of fact and of weight and credibility for the jury to resolve."). *See also Coleman v. State*, 697 So.2d 777, 782 (Miss. 1997) (If instructions fairly state the law and create no injustice, no reversible error will be found.). In fact, the authority cited by Scott does not support his position. Scott cites *Hall*

*v. State*, 83 So. 513, 522 (Fla. 1919) (It is improper segregate ... any fact from all the material facts sought to be established), and *Mills v. State*, 625 S.W.2d 47 (Tex. App. 1981) (an instruction which singles out limited parts of evidence is error), which also do not support singling out, Lurline's testimony.

¶128. In the case sub judice, the trial court, in denying the proposed instruction D-1A, stated that "[W]e cannot have an all-inclusive list of those things that are not aggravating circumstances."

¶129. In S-1A, the trial court also cautioned the jury to "not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." This Court has repeatedly held that jury instructions are to viewed as a whole. *See Smith v. State*, 835 So.2d 927, 937 (Miss. 2002) ("Jury instructions are to be read together and taken as a whole with no one jury instruction taken out of content"); *Milano v. State*, 790 So.2d 179, 183 (Miss. 2001) ("When considering a challenged to a jury instruction on appeal, we do not review jury instructions in isolation; rather, we read them as a whole to determine if the jury was properly instruction.").

¶130. This Court finds that this issue is without merit. Scott's concern that the jury know what aggravating circumstances should be considered in sentencing was adequately addressed in instruction S-1A.

## XV. Sentencing Instructions

¶131. Scott argues that the sentencing instruction given by the trial court improperly instructed the jury that it had to unanimously find that mitigating circumstances exist, and that those mitigating circumstances must outweigh any aggravating circumstances. The record reflects that in instruction S-1A which was also discussed in Issue XIV, the trial court gave in pertinent part the following instruction on mitigating circumstances:

> If one or more of the above aggravating circumstances is found to exist beyond a
> reasonable doubt, then you must consider whether there are mitigating circumstances which

outweigh the aggravating circumstance (s). Consider the following elements of mitigation in determining whether the death penalty should be imposed:

(1) any matter, any other aspect of the defendant's character or record, any other circumstance of the offense brought to you during the trial of this cause which you, the jury, deem to be mitigating on behalf of the defendant.

If you find from the evidence that one or more of the preceding elements of mitigating exists, then you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death sentence.

¶132. The trial court's instruction does not state that the jury must unanimously find the existence of mitigating circumstances. Scott contends that because the trial court specifically instructed the jury that they had to unanimously find the existence of one or more of the aggravating circumstances to impose the death penalty, then the trial court should have specifically stated that the jury did not have to unanimously find the existence of mitigating circumstances. We find that this issue is wholly without merit and contrary to prior holdings of this Court.

¶133. First, the State argues that Scott never objected to the instruction, and Scott does not indicate where in the record he ever voiced any objection to the wording of the sentencing instruction as to mitigating circumstances. Therefore, the State submits that Scott is procedurally barred from now raising any objection for the first time on appeal. *See Williams v. State*, 684 So.2d at 1203.

¶134. Second, this Court has repeatedly approved sentencing instructions similar to the one in the case sub judice. In *Edwards v. State*, 737 So.2d 275, 313 (Miss. 1999), the Court addressed similar argument raised regarding the requirement for an unanimous finding as to aggravating circumstances but silence as the need for a unanimous finding as to mitigating circumstances. The Court did not require the

instruction to specifically stated that the jury was not required to unanimously find the existence of mitigating circumstances. *Id*. Silence, as we have in the case sub judice, was proper. *Id*. The Court stated:

> In *Shell v. State*, 554 So.2d 887 (Miss. 1989), this Court addressed this very issue holding that since "unanimous" was only found in section for aggravating circumstances there was no corresponding requirement for the mitigating circumstances. *Shell v. State*, 554 So.2d 887, 905 (Miss. 1989), rev'd on other grounds, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990). In the present case, there is no such unanimity requirement for mitigating circumstances in these instructions. Instructions CS-2 and CS-3 required a unanimous finding beyond a reasonable doubt of aggravating circumstances. It cannot be reasonably inferred that the silence of instruction CS-2 as to finding mitigating circumstances would likely cause the jury to assume that unanimity was also a requirement. This assignment of error is without merit.

737 So.2d at 313.

¶135. Scott argued that the sentencing instruction violated the holdings of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). This Court in *Davis v. State*, 684 So.2d 643, 664-65 (Miss. 1996), addressed the same argument made by Scott regarding *Mills* and *McKoy*. The Court stated:

> Davis complains that the jury was never instructed that mitigating circumstances were to be found individually and not unanimously prior to being considered in the weighing process. In summary, Davis argues that because findings of aggravating circumstances had to be unanimous, reasonable jurors may have reached a like conclusion concerning the finding of mitigating circumstances. Davis relies upon *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990); *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); and *State v. McNeil*, 327 N.C. 388, 395 S.E.2d 106 (1990), *cert. denied*, *North Carolina v. McNeil*, 499 U.S. 942, 111 S.Ct. 1403, 113 L.Ed.2d 459 (1991) (holding that oral instructions which require a jury to find mitigating circumstances unanimously to be reversible error).
>
> Other courts have extended the holdings of *McKoy* and *Mills* to reverse death sentences where the jury was not told explicitly that mitigating circumstances are to be found and weighed by individual jurors. However, this Court in **Hansen v. State**, 592 So.2d 114, 149-50 (Miss. 1991), declined to extend these holdings. Where the instruction does not use the words "unanimously" nor "unanimous" in the mitigating circumstances portion of the jury instructions "but instead is found only in the aggravating circumstances portion," we have held that the instruction does not offend the holding in

61

Mills. *Id*. This Court has previously rejected this argument. *See, e.g.*, **Ladner v. State**, 584 So.2d 743, 760 (Miss. 1991); **Willie v. State**, 585 So.2d 660, 681 (Miss. 1991); **Turner v. State**, 573 So.2d 657, 668 (Miss. 1990); and **Shell v. State**, 554 So.2d 887 (Miss. 1989), *reversing on other grounds*, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990).

As to mitigating circumstances, Sentencing Instruction S-2 in the case *sub judice* reads:

> Next, to return the death penalty, you must find that the mitigating circumstances -- those which tend to warrant the less severe penalty of life imprisonment -- do not outweigh the aggravating circumstances -- those which tend to warrant the death penalty.
>
> If you find from the evidence that one or more of the proceeding elements of mitigation exists, then you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death penalty sentence. Should you find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance(s), you shall not impose the death sentence....

Davis fails to highlight any portion of the record in which the jury was instructed orally or in writing that it should unanimously find mitigating circumstances. As it stands, Instruction S-2 is not violative of the **Mills/McKoy/McNeil** line of cases. At no point was the jury instructed that it was to determine mitigating circumstances unanimously. Had there been an instruction to the jury that they were to find mitigating circumstances unanimously, then Davis would have presented a meritorious claim.

¶136. This Court finds that this assignment of error is without merit. Scott's argument ignores prior holdings by this Court.

## XVI. Defining Mitigation

¶137. Scott complains that the trial court gave the standard of proof for aggravating circumstances numerous times in the instructions, yet never defined the standard of proof for mitigation. He claims that the instruction that was given failed to adequately define the standard for mitigation and the jury was uncertain, therefore, as to the standard to use when weighing the evidence of beyond a reasonable doubt

or preponderance of the evidence. The State asserts that Scott did not object to the instruction and it is procedurally barred on appellate review. Indeed, the record reflects that Scott did not object to the instruction.

¶138. This Court in *Holland v. State*, 705 So.2d 307, 354 (Miss. 1997), found no error when an instruction failed to give the burden of proof for any mitigating factors. This Court held:

> Holland also asserts that denial of the original D-22 was error. The amended D-22 omitted the part of the original D-22 which stated, "You must find a mitigating circumstance if it is proven by a preponderance of the evidence."
>
> Holland cites no support for his assertion. Accordingly, it is barred under *Kelly v. State*, 553 So.2d 517, 521 (Miss.1989). Furthermore, alternatively, **considering the merits of this issue, this Court's holding in *Conner v. State*, 632 So.2d 1239, 1271-72 (Miss.1993), cert. denied, 513 U.S. 927, 115 S.Ct. 314, 130 L.Ed.2d 276 (1994), expressly refused to find error in an instruction which did not give the exact burden of proof for mitigating factors. Thus, there is no merit to this issue.**

*Holland*, 705 So.2d at 354 (emphasis added). Accordingly, we find that the trial court did not err by not giving an instruction with the burden of proof for mitigating factors. This issue is without merit.

## XVII.  Avoiding Lawful Arrest Aggravator

¶139. Scott argues that "the trial court impermissibly submitted to the jury the aggravating circumstances that the capital offense was committed for the purpose of avoiding or preventing a lawful arrest." Scott further alleges that "no evidence was placed into evidence by the prosecution as to this aggravating circumstance and none can be logically deduced from the evidence." Scott does not provide any relevant authority, other than citing Miss. Code Ann. § 99-19-101(5) in support of his position. The jury

63

unanimously found the aggravating circumstance that Scott committed the capital offense for the purpose of avoiding or preventing a lawful arrest.[7]

¶140.   The State argues that the evidence presented at trial amply supported the submission of this aggravating circumstance.  Alternatively, the State correctly contends that this Court is required to perform a re-weighing/harmless error analysis should it determine that the "preventing a lawful arrest" aggravating circumstance is invalid.  *See* Miss. Code Ann. § 99-19-105(5)(b).  *See also* **McGilberry v. State**, 843 So.2d 21, 29 (Miss. 2003) ([I]f it deems an aggravator invalid, the Court is authorized to re-weigh the remaining aggravators against the mitigating circumstances and affirm, hold the error to be harmless, or remand for a new sentencing hearing).

¶141.   Under Mississippi law, the death penalty may be imposed only where the jury unanimously finds in writing that sufficient aggravating circumstances exist.  Miss. Code Ann. § 99-19-101(3)(b).  One such aggravating factor requires the jury to consider whether "[t]he capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody."  Miss. Code Ann. § 99-19-101(5)(e).

¶142.   "The standard for reviewing the sufficiency of the evidence to support an avoiding lawful arrest instruction is well-settled[.]"  **Wiley v. State**, 750 So.2d 1193, 1206 (Miss. 1999) (quoting **Woodward v. State**, 726 So.2d 524, 541 (Miss. 1997) (internal quotation marks omitted)).

> Each case must be decided on its own peculiar facts.  If there is evidence from which is my be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance.

---

[7] Additionally, the jury also unanimously found the aggravating circumstance that Scott committed the capital offense while engaged in or as an accomplice to the commission of the crime of robbery.

*Wiley*, 750 So.2d at 1206 (quoting *Chase v. State*, 645 So.2d 829, 858 (Miss. 1994)). Therefore, this Court must determine whether "' there is any credible evidence upon which the jury could find the aggravating circumstance in question."' *Id*. (quoting *Woodward*, 726 So.2d at 541).

¶143. This Court has considered the "preventing lawful arrest" aggravating circumstance in numerous cases. *See*, *e.g.*, *Hughes v. State*, 735 So.2d 238 (Miss. 1999); *Wiley v. State*, 750 So.2d 1193 (Miss. 1999); *Walker v. State*, 740 So.2d 873 (Miss. 1999); *Edwards v. State*, 737 So.2d 275 (Miss. 1999); *Foster v. State*, 687 So.2d 1124 (Miss. 1996); *Brown v. State*, 682 So.2d 340 (Miss. 1997); *Taylor v. State*, 672 So.2d 1246 (Miss. 1996).

¶144. The Court's analysis on this issue is fact specific. Therefore, a review of the record is necessary to determine whether the aggravating circumstance was properly submitted to the jury. The crimes in this case were committed in Boyle, Mississippi. Scott did not live in Boyle or in Cleveland, Mississippi. Therefore, the State argues that Scott and Lynch went to another town where their identities would be unknown. Additionally, the State argues that Scott and Lynch followed Lee home rather than trying to take his automobile at a public place. Scott testified that he "laid the seat all way back." The State submits he laid the seat back to presumably avoid being seen or identified while waiting.

¶145. Two shots were fired at Lee's wife, Lurline. Lurline testified that when she opened the garage door to see what was going on, Scott saw her and fired at her. Lurline testified that she ducked, narrowly missing being shot and locked herself in the bathroom to call for assistance. Scott presumably did not want Lurline to be able to later provide eye-witness identification.

¶146. Moreover, the State argues that the facts indicate that Scott and Lynch had "plotted from the beginning to avoid arrest and cover their tracks." The State contends that it is reasonable to infer that Scott and Lynch had planned to meet back up at the old gin in Bobo to hid the stolen car.

¶147. Scott testified that he fled from the scene in the Lee's automobile. Officer Haney testified that he chased Scott at speeds of up to 115 miles per hour, but he never caught up with the automobile. The vehicle was found in an area that was "pretty well growed up" with "heavy weeds" behind the old gin in Bobo. The gun used to kill Lee, Scott's jacket and wallet, which contained his identification, were found near the abandoned automobile. Scott left the automobile in Bobo and returned home to Davenport by getting a ride. Upon arriving at home, he changed clothes "because blood and stuff was on [his] pants and everything."

¶148. When Scott was arrested, he gave two different statements to the police before later testifying to something different at trial. *See **Manning v. State***, 735 So.2d 323, 350 (Miss. 1999) (where the defendant lied to police and denied being present at the crime scene acted to support "avoiding lawful arrest" as an aggravator).

¶149. Considering the sizeable amount of evidence in the record to support the aggravating factor, we conclude that there is sufficient evidence from which it may be reasonably inferred that a substantial reason for killing Lee was to conceal the identity of the killer or killers so as to avoid apprehension and eventual arrest by authorities. Therefore, we find that the trial judge did not err in charging the jury as to the "preventing lawful arrest" aggravator. Furthermore, as the record indicates, the jury also concluded that Scott was engaged or acting as an accomplice in the commission of robbery which is another aggravating factor.

## XVIII. Sympathy Instruction.

¶150. Scott next argues that the trial court erred by instructing the jury that it could not consider sympathy. He cites to three portions of the record to support his proposition. These three instances occurred (1) soon after the jury pool gathered together, (2) at the sentencing phase closing statements and (3) an

"antisympathy" instruction during guilt phase closing arguments. He claims that he has a right to not have the jury instructed that they can disregard sympathy in toto. The instructions at issue are as follows:

1.      Jury pool

        Juror must be as free as humanly possible from bias, prejudice or sympathy. And jurors must not be influenced by preconceived ideas, either as to facts or as to the law.

2.      Closing arguments (sentencing phase)

        You should consider and weigh any aggravating and mitigating circumstances as set forth later in this instruction, but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling.

3.      Closing argument guilt phase

        It is your duty to determine the facts and to determine them from the evidence that has been produced here in open court. You're to apply the law to the facts, and in this way, of course, you shall decide the case. You should not be influenced by bias, sympathy or prejudice. Your verdicts should be based on the evidence and not upon speculation, guesswork or conjecture.

¶151. In *Jordan v. State*, 786 So.2d 987, 1025 (Miss. 2001), this Court addressed a similar issue concerning sympathy instructions. This Court held:

> Jordan claims that the court should not have given Instruction No. C-1, that the jury was not to be influenced by sympathy. We have considered this exact issue in *Holland v. State*, 705 So.2d at 351, where we approved a jury instruction which reads verbatim like the one about which Jordan complains. In *Holland*, we found that such an instruction does not mean that the jury should totally disregard sympathy and is, therefore, permissible.

*Jordan*, 786 So.2d at 1025. *Jordan* does not give the language of the instruction other than to say the language is "verbatim" in *Holland*. Accordingly, the language in *Holland* at issue was the following:

**The trial court instructed the jury in C-1 that it could not be influenced by bias, sympathy, or prejudice, and that the verdict could not be based**

67

**upon speculation, guesswork or conjecture.** Holland states that this instruction was error. *See* ***Pinkney v. State***, 538 So.2d 329, 351 (Miss.1988), vacated on other grounds by ***Pinkney v. Mississippi***, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990). Holland's proposed instruction left out the word sympathy.

Recent Mississippi caselaw permits a C-1 type instruction if the instruction does not totally shut off consideration of sympathy. ***Willie v. State***, 585 So.2d 660, 677 (Miss.1991). Court has also held that the use of the words "not to be influenced by sympathy" does not mean that the jury is instructed to disregard sympathy. ***Ladner v. State***, 584 So.2d 743, 759 (Miss.1991), cert. denied, 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991).

*Holland*, 705 So.2d at 351 (emphasis added). Scott relies in part on ***King v. State***, 784 So.2d 884, 889 (Miss. 2001), in which "King insists that no two instructions could have more clearly instructed the jury to disregard sympathy in toto than '[y]ou ... must not consider sympathy as part of this case' and 'sympathy [can] have no part in your deliberations.'" ***Id***.

¶152.   In ***King*** we held:

In ***Blue v. State***, 674 So.2d 1184, 1225 (Miss.1996), we approved an instruction which read in pertinent part as follows:

> [Y]ou are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.

"[B]ecause the instruction does not inform the jury that it must disregard in toto sympathy ... the instruction is a proper statement of the law." ***Id***. While we have approved this type of general instruction admonishing the jury not to be swayed by "sympathy" unrelated to the evidence, we have guarded against any undue emphasis of the anti-sympathy admonition so as not to fetter unduly reasoned consideration of factors offered as mitigating. *See* ***Willie v. State***, 585 So.2d 660, 677 (Miss.1991). We do this in full recognition of the fact that the line between a rational and an emotional response is often dim.

*King*, 784 So.2d at 889. This Court finds that the trial court never told the jury to completely disregard sympathy in toto in violation of the Eighth Amendment. *King*, 784 So.2d at 899. "We have repeatedly held that under the Eighth Amendment to the U.S. Constitution, 'a jury may not be instructed to disregard,

68

in toto, sympathy' in a capital case." *Id.* (citing **Pinkney v. State**, 538 So.2d 329, 351 (Miss.1988), *vacated and remanded on other grounds*, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990)). Rather, this trial judge merely instructed the jury to "be as free as humanly possible from ...sympathy", not to be "influenced" and not to be "swayed" by sympathy. Unlike the trial judge in **King**, the trial judge here did not instruct the jury with the same language, that being "[y]ou ... must not consider sympathy" and "sympathy [can] have no part in your deliberations" nor did he instruct the jury to definitively disregard sympathy in toto. Further, the language of the trial court here has already passed muster with this Court. *See* **Holland**, 705 So.2d at 351, **Blue v. State**, 674 So.2d at 1225; **Ladner v. State**, 584 So.2d at 759. Further, the jury received a catch-all instruction which stated:

> Consider the following elements of mitigation in determining whether the death penalty should not be imposed: Any matter - - any other aspect of the defendant's character or record, any other circumstances of the offense brought to you during the trial of this cause which you, the jury, deem to be mitigating on behalf of the defendant.

"This Court long has accepted the use of a 'catch-all' to encompass any mitigating circumstances not specifically enumerated under Miss. Code Ann. § 99-19-101(6)[concerning the jury determination of death penalty mitigating factors]." **Wiley v. State**, 750 So.2d 1193, 1204 (Miss. 1999) (quoting **Jackson v. State**, 684 So.2d at 1213, 1238 (Miss. 1996)). We find that the language used by the trial court to instruct the jury is well recognized as within the acceptable parameters designated in prior cited case law by this Court and the jury also had the catch-all instruction in which it could consider any other matter. Accordingly, this Court finds that the trial court did not err in giving these instructions and this issue is without merit.

## XIX. Photographs

69

¶153.   Scott asserts that the trial court erred in allowing crime scene photographs of the victim into evidence.  Scott argues that the photographs offered little if any probative value.  Specifically, Scott references photographs S-36E and S-36 A-H.  The defense erroneously refers to S-36 A-H as autopsy photographs in its brief.  However, the autopsy photographs are exhibits S-38 A-H.

¶154.   The defense interestingly contends in this issue that "the identity of the perpetrators was hardly an issue in this case.  Kevin Scott and Leroy Lynch both gave statements to the police detailing their involvement and numerous witnesses testified as to their identities."  The defense further argues that the photographs should not have been admitted into evidence because "the photographs were not needed to prove any fact that was important to the State's case."

¶155.   At trial, Scott objected to photograph S-36-E being admitted into evidence. Photograph S-36-E, which was admitted by the first officer on the scene, Officer Quinton, was admitted during the guilt phase. The photograph was of Lee's body taken from a distance, lying on the empty carport with emergency personnel providing medical assistance.  Lee's clothes, except for his underwear, had been removed by the emergency personnel.  As noted, by the trial court, no blood is shown in the photograph.

¶156.   The record reflects the following exchange:

| | |
|---|---|
| Defense: | I will repeat my objection.  I am objecting to S-36E for being more prejudicial than probative. |
| The Court: | May I see it, please?  (Court reviews photograph.)<br>Your response Mr. Mellen? |
| State: | I do not see how it would be prejudicial at all.  This is the victim's  -- at the scene. |
| The Court: | All right.  Well, let me ask that you suggest to the Court that tends to corroborate the testimony of Commander Quinton. |
| State: | Well, Your Honor, he had stated that he arrived there, that the victim was in the scene.  He's shown a diagram where the victim's body is depicted in the diagram.  And then the witness has testified that personnel did arrive and attempted to resuscitate.  And -- could I approach just a moment with Mr. Wong? |

70

| The Court: | Yes, sir. |
| | (CONFERENCE AT THE BENCH BETWEEN THE COURT AND COUNSEL WITHOUT THE HEARING OF THE JURY AS FOLLOWS, TO-WIT:) |
| State: | Your Honor, you may recall that I had attempted to introduce several photographs last time, and I think there was an objection because of the number of them. We did not do that, but I ask to be allowed to introduce one. And I'm only attempting to introduce the one -- |
| The Court: | You'll have to put something in the record to show probative value, that's all. |
| State: | Yes, sir. And this is the victim at the scene. And actually, there's not blood or no anything. It just shows him with his clothing removed. |
| The Court: | I was going to note that. |
| State: | Yes, sir. |
| The Court: | |
| | (BENCH CONFERENCE CONCLUDED. THE FOLLOWING PROCEEDINGS WERE HELD WITHIN THE HEARING OF THE JURY AS FOLLOWS, TO-WIT:) |
| The Court: | All right. Mr. Mellen, did you wish to say anything further in terms of the probative value? |
| State: | Your Honor, it just simply shows what the witness has testified to and the victim there in the carport within a few moments of his arrival. |
| The Court: | All right. The Court finds that the picture does not show any gruesome scenes, that the picture does tend to corroborate the testimony of Commander Quinton; therefore, the probative value does outweigh any suggestive prejudicial effects. And in accordance therewith, it is hereby admitted into evidence. |
| | (WHEREUPON EXHIBIT 36-E IS RECEIVED IN EVIDENCE.) |

¶157. In addition to S-36-E, Scott contends that the autopsy photographs, S-38-A-H, should not have been admitted. The record reflects that the autopsy photographs were introduced, over the defendant's objection, during the testimony of Dr. Hayne. The trial court conducted a bench conference as to the photographs during which the following exchange occurred:

| Defense: | Your Honor, for purposes of the record, we are going to object to S-36A through H [sic] [S-38A-H] inclusive, which are all -- I think the autopsy photographs of Dr. Hayne concerning Mr. Richard Lee. I don't think they are needed to clarify the testimony of Dr. Hayne. He has adequately shown the results, and I think they're more prejudicial than probative is the issue. |

71

The Court:    Okay.  Let me go through them once more.  And I have them back in correct order.  (Court reviews photographs.)  The Court finds that the pictures are not gruesome, that they are consistent with testimony given; therefore, they tend to corroborate the testimony of Dr. Steven Hayne. So the objection is overruled.  The defendant's objection is noted on the record.

Defense:     All right.

¶158.   This Court held that the admissibility of pictures of gruesome crime scenes is within the sound discretion of the trial court.  *Chatman v. State*, 761 So.2d 851, 854 (Miss. 2001).  Reversal of the trial court will occur only where there is a clear abuse of discretion.  *Id*.; *Davis v. State*, 551 So.2d 165, 173 (Miss. 1989).  "The discretion of the trial judge 'runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value.'"  *Spann v. State*, 771 So.2d 883, 895 (Miss. 2000) (quoting *Williams v. State*, 544 So.2d 782, 785 (Miss. 1987)).  Some probative value is the only requirement needed in order to support a trial judge's decision to admit photographs into evidence.  *Jordan v. State*, 728 So.2d 1088, 1094 (Miss. 1998).

¶159.   Photographs are considered to have evidentiary value in the following instances:

(1)      aid in describing the circumstances of the killing;
(2)      describe the location of the body and cause of death;
(3)      supplement or clarity witness testimony.

*Spann v. State*, 771 So.2d at 895 (quoting *Westbrook v. State*, 658 So.2d 847 (Miss. 1995)).

¶160.   In *Davis v. State*, 551 So.2d at 173, this Court held that "photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied, and the corpus delicti and the identity of the deceased have been established."  However, this Court stated that photographs of bodies may be admitted into evidence if they have probative value, are not too gruesome and are not used in an overly prejudicial or inflammatory way in a criminal case.  *Id*.  In *Davis*, this Court recognized that

72

the defendant killed the victim and as such there was no need to establish the identity of the killer or victim.

*Id*. The Court found that the photographs had probative value and were properly admitted into evidence.

*Id*.

¶161. Despite the objections at trial, Scott erroneously claims on appeal that the photographs had no probative value since Scott's identity as the perpetrator was not an issue. However, in other issues, unlike in *Davis*, defense counsel denies that Scott had anything to do with Lee's murder. Clearly, Scott has not established that the trial court erred in admitting the photographs. This Court finds that this issue is without merit.

## XX. Jury Deliberations.

¶162. Scott contends that the trial court erred by returning the jury to deliberate after the jury had returned a verdict less than death. The record reflects the following:

| | |
|---|---|
| The Court: | Juror No. 11 again. Has the jury reached a verdict? |
| Juror No. 11: | We have. |
| The Court: | Is that verdict unanimous? |
| Juror No. 11: | No, it's not. |
| The Court: | All 12 of you did not agree on the verdict? |
| Juror No. 11: | No, we did not. |
| The Court: | I think I know what it is. |
| | (CONFERENCE AT THE BENCH BETWEEN THE COURT AND COUNSEL WITHOUT THE HEARING OF THE JURY AS FOLLOWS, TO-WIT:) |
| Defense: | There is an - - if I may, if (inaudible) one of the three choices, I'm denying unanimity of a sentence. |
| The Court: | Wait a minute. |
| State: | I don't understand a word he said. |
| Defense: | All right. I think one of the choices was a unanimity of the sentence as the choices, That's the three choices that they had, life, death, or we can't reach an agreement. |
| The Court: | All right. Do ya'll [have] any problem with the Court looking into the verdict? |
| State: | Yes, sir. I don't think you should. I think they should be sent back, actually, and try to reach a verdict. |

73

The Court: I think - - I could be in error, but I think what it is, is that due to their failure to reach a unanimous verdict, they have chosen the third option.

State: Well, i understand that. I mean, that is definitely what they're doing, but - -

The Court: I understand what you're saying.

Defense: All right.

The Court: Okay.

(BENCH CONFERENCE CONCLUDED. THE FOLLOWING PROCEEDINGS WERE HELD WITHIN THE HEARING OF THE JURY AS FOLLOWS, TO-WIT:)

The Court: To the jury, I take it that you are saying to the Court that - - and I think you have already said to the Court all 12 of you could not agree upon a verdict, but you have nevertheless, in some way or another, reached a decision as to what you would do; is that correct?

Juror No. 11: That is correct.

The Court: Let me ask, would further deliberation among yourselves enhance the chances of you reaching some consensus as to a verdict in this case?

Juror No. 11: We tried, Your Honor.

The Court: I know you did try. But I'm asking are there any chances?

Juror No. 11: No, sir.

The Court: After - - if the Court admonishes you all to go back and deliberate further - -

Juror No. 11: - - we could try.

The Court: All right. One moment, please.
Okay. In such an instance as this, the Court routinely reads an additional instruction for you. I ask that you give it your careful attention.

Defense: Your Honor, before we do that, can we approach the bench at this time?

The Court: Yes, sir.

(CONFERENCE AT THE BENCH BETWEEN THE COURT AND COUNSEL WITHOUT THE HEARING OF THE JURY AS FOLLOWS, TO-WIT:)

Defense: They have chosen a non[-]unanimity as a verdict, and that means they have a split somewhere. We will accept that.

State: Well, we don't.

Defense: I mean, I - - okay. Well, I mean, I'm just letting you know for the record that we accept it. All right. And the State has stated that they don't. I just want that on the record that we would accept a nonunanimity - -

State:                      Judge, I think the record ought to show that they knocked in something like 30 minutes of deliberation, and only that, for 29 minutes.

Defense:               No, 33.

The Court:          Okay.

Defense:               All right.

(BENCH CONFERENCE CONCLUDED. THE FOLLOWING PROCEEDINGS WERE HELD WITHIN THE HEARING OF THE JURY AS FOLLOWS, TO-WIT:)

The Court:         Ladies and gentlemen of the jury, this is an instruction that the law compels the presiding Judge to read in an instance where there is nota unanimous verdict in a criminal case. Again, I ask that you give it your careful attention.

I know that it was impossible - - I'm sorry, let me start again. I know that it is possible for honest men and women to have honest different opinions about the facts of the case, but if it is possible to reconcile the differences of opinion and decide the case, then you should do so accordingly.

I remind you that the Court originally instructed you that the verdict of the jury must represent the considered judgment of each juror. It is your duty as jurors to consult with one another and to deliberate in view of reaching an agreement if you can do so without violence to you individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration fo evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to reexamine your own views and change your opinions if you are convinced that it is erroneous. Bt do not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of your fellow jurors of for the mere purpose of returning a verdict.

I ask, therefore, that you please continue your deliberations. Please return to the jury room.

After further deliberations, the jury unanimously found that Scott should suffer the death penalty for the killing of Lee.

¶163. Scott argues that the jury instructions gave the jury three options; those being, the death penalty, life imprisonment without parole and the jury's inability to agree unanimously on a punishment. Relying upon ***Bullington v. Missouri***, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), Scott contends that the prosecution failed to present a case in which all jurors were convinced of the imposition of the death penalty, therefore, the trial judge should have sentenced Scott to life imprisonment. From these proceedings, Scott appears to maintain that he actually received a life sentence but for the fact that the trial court incorrectly subjected him to a second capital sentencing determination by sending the jury back for further deliberations. Scott argues that the first time the jury came out of deliberations and told the judge that they had no unanimous verdict, he should have received life imprisonment. He argues that sending the jury back for further deliberations violated the double jeopardy clause of the Fifth Amendment

¶164. The State argues that this issue is procedurally barred by Scott's failure to object, not raising the issues at trial, nor requesting a mistrial citing ***Williams v. State***, 684 So.2d at 1203. Even assuming ad arguendo that the defense objected by claiming he would accept a non-unanimous verdict, the State claims that Scott never claimed a due process or double jeopardy violation and thus the issue was not preserved for appellate review. We find that the State is correct, Scott never objected at trial and never raised the due process or double jeopardy claims.

¶165. Miss. Code Ann. § 99-19-103 states in part: "If the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life." However, in ***Smith v. State***, 729 So.2d 1191, 1221 (Miss. 1998), this Court held that pursuant to the statute, the trial court determines what constitutes a "reasonable time." "[I]t was up to the trial judge to dismiss the jury and impose a life sentence if the jury had not reached a verdict within a reasonable amount of time. The trial judge was in a much better position than this Court to determine what was in fact a

76

reasonable time." *Id.* Here, no imposition of a life sentence was given by the jury, and the trial court determined what the reasonable time period was for the jury.

¶166.   Scott made no objection at trial based on double jeopardy, and he did not request a mistrial. Although we review death penalty cases under a heightened standard of scrutiny, our contemporaneous objection rule nevertheless remains unaltered and applicable in such cases. *Williams*, 684 So.2d at 1203. That is, the contemporaneous objection rule applies with equal force in death penalty cases, and we have long "held that trial errors cannot be raised in this Court for the first time on appeal." *Id.* (citing *Jefferson v. State*, 386 So.2d 200, 202 (Miss. 1980)). Scott's attorney stated at trial that he would accept a non-unanimous jury decision as the verdict. Specifically, he stated: "I'm just letting [the court] know for the record that we accept it," referring to the non-unanimous decision of the jury. This statement could not be considered an objection. This is a statement of acquiescence, not opposition. Such a statement of acceptance or acquiescence cannot be interpreted as an objection. Scott did not object on the grounds of due process, and his acceptance of the decision as non-unanimous was not an objection at all. Because Scott did not at the trial object on any ground, we are procedurally barred from considering this issue. Even though this is a death penalty case subject to heightened scrutiny, Scott's failure to make a timely objection bars us from considering these arguments.

¶167.   The trial court's decision to return the jury to deliberate did not constitute plain error. Under Mississippi law, juries have three options during the sentencing phase of a capital case. Specifically, the jury must decide "whether the defendant should be sentenced to life imprisonment, life imprisonment without the eligibility of parole, or death." Miss. Code Ann. § 99-19-101.

¶168.   It is true that the jury foreperson stated the jury had not yet reached a unanimous verdict. The foreperson also expressed doubt as to whether further deliberations would produce a unanimous verdict.

77

However, the jury foreperson stated the jury **could endeavor** to reach a unanimous verdict. The trial court stated: "if the [c]ourt admonishes you all to go back and deliberate further," and the foreperson interrupted the question, stating, '**we could try**." This is clearly not evidence of an inability to reach a unanimous verdict. It is merely evidence of sharp disagreement between the jurors. Such disagreement is natural in a stressful trial such as the one below. It is common that during jury deliberations in a death penalty case there will be heated debates and passionate discussion of the issues, and reasonable people disagree even in less serious cases. But what we have here is not a statement by the jury that they would forever be unable to reach a unanimous verdict. The foreperson stated that the jury **could try** - that is, try to resolve their disagreements and reach a unanimous verdict. It is also noteworthy that the jury had only deliberated for thirty minutes, which obviously the trial judge considered as insufficient for discussion regarding a death penalty case.

¶169. Next, a signed jury instruction indicating a non-unanimous verdict in this case is in the court file. However, nothing in the record demonstrates that the trial judge ever saw this document after it was given to the jury. The State objected when the trial judge inquired whether to read the jury verdict. Because the State objected, the judge did not read it and instead gave the jury an additional *Sharplin* instruction. If a mistake was made, it was that the trial judge should have looked at whatever the jury foreman possessed. He did not do so, and we cannot speculate. Thus, at the point the trial judge gave the *Sharplin* instruction, there had been no jury verdict submitted to the court.

¶170. At oral arguments before this Court, Scott's defense counsel admitted he had fished out of a jury room trash can a document which also purportedly shows that there was not a unanimous verdict. As Scott's attorney, Wong, stated at oral arguments, he found it and "stuck it in the record." However, this document was not submitted by the jury to the trial court as a verdict. Also, it was not submitted on post-

trial motion to the trial court. The only reason we are even aware of this piece of trash recovered from the receptacle is that Scott's attorney had it added to the court papers after the trial. Thus, we find that the only verdict actually given to the court was the one sentencing Scott to death, and we should give effect to that legally-imposed sentence.

¶171. The overriding and inescapable principle in this case is that this Court does not decide cases based on items that are not in the record. More specifically, we cannot, should not, and before today, would not reverse any case based on facts that are not in the official court record. It is inconceivable that any court would make such a decision. We find that the trial court did not commit any error in sending the jury to deliberate further.

¶172. Of course, the two documents discussed previously appear in the court papers submitted to this Court, but the trial judge never saw either of them. The only verdict in the record is the one sentencing Scott to death by lethal injection. Deciding cases based on items found in the courtroom trash can and mysteriously inserted into the record is not and should not become the business of this Court, or for that matter, any court.

¶173. Accordingly, we find that this issue is without merit.

### XXI. Prosecutions misstatement of the law on mitigating circumstances.

¶174. Scott argues that the prosecution denigrated his evidence offered as mitigation factors at trial. In addition, Scott argues that the prosecution misstated the law in three ways: (1) the jury was told their responsibility under the law of God and man was to return a verdict for death; (2) the prosecution attempted to persuade the jury that mitigating evidence was merely an "excuse"; and (3) the prosecution implied that the prosecutors and jury share a common role in this case.

¶175. A review of the entire section of the closing statements by the prosecution and defense reveals that there were no contemporaneous objections by defense counsel. This Court has held that contemporaneous objects rules for the preservation of an issue on appeal apply in death penalty cases. *Williams v. State*, 684 So.2d at 1203; *See also Simmons v. State*, 805 So.2d 452, 489 (Miss. 2001)(death penalty case); *Cole v. State*, 525 So.2d 365, 368 (Miss. 1988). Accordingly, this Court finds that this issue is procedurally barred from review.

## XXII. Juror's difficulty in answering questionnaire.

¶176. Scott next complains that his constitutional rights of equal protection were violated by excluding Juror 293, Geneva Bradley (Juror Bradley), from service without precisely knowing why she was unable to complete the juror questionnaire.

¶177. Miss. Code Ann. § 13-5-1 requires that potential jurors are literate. The statute states:

> **Every citizen not under the age of twenty-one years**, who is either a qualified elector, or a resident freeholder of the county for more than one year, **is able to read and write**, and has not been convicted of an infamous crime, or the unlawful sale of intoxicating liquors within a period of five years and who is not a common gambler or habitual drunkard, is a competent juror. No person who is or has been within twelve months the overseer of a public road or road contractor shall, however, be competent to serve as a grand juror. The lack of any such qualifications on the part of one or more jurors shall not, however, vitiate an indictment or verdict. Moreover, no talesman or tales juror shall be qualified who has served as such talesman or tales juror in the last preceding two years, and no juror shall serve on any jury who has served as such for the last preceding two years. No juror shall serve who has a case of his own pending in that court, provided there are sufficient qualified jurors in the district, and for trial at that term.
>
> **In order to determine that prospective jurors can read and write, the presiding judge shall, with the assistance of the clerk, distribute to the**

**jury panel a form to be completed personally by each juror prior to being empaneled as follows**:

> "1.  Your name _____ Last _____ First _____
>        Middle initial
>
> 2.  Your home address _____
>
> 3.  Your occupation _____
>
> 4.  Your age _____
>
> 5.  Your telephone number _____ If none, write none
>
> 6.  If you live outside the county seat, the number of miles you live
>     from the courthouse _____ Miles
>
> _____
> Sign your name"

> **The judge shall personally examine the answers of each juror prior to empaneling the jury and each juror who cannot complete the above form shall be disqualified as a juror and discharged.**

> A list of any jurors disqualified for jury duty by reason of inability to complete the form shall be kept by the circuit clerk and their names shall not be placed in the jury box thereafter until such person can qualify as above provided.

Miss. Code Ann. § 13-5-1 (emphasis added).  Clearly, this statute provides that among other things a competent juror be able to read and write.  In order to determine whether a prospective juror can read or write, a form is distributed with questions to filled out by the juror.  Prior to empaneling the jury, the judge will review the questionnaire answers and any juror who is unable to complete the form shall be disqualified and discharged.

¶178.   The record shows the following exchange:

The Court:              The law requires that all jurors be able to read and write. And in order to accomplish this, a form has been prescribed which consists of six questions.  They must be answered by you, and

|  |  |
|---|---|
|  | they must be answered by you in your own handwriting. Let me ask: Are each of you able to read and write? Do we have anyone sitting among us who cannot read and write? |
|  | (No jurors respond in the affirmative.) |
| The Court: | That's very good for such a large pool or jurors. |
|  | (Juror no. 293 responds.) |
|  | Almost very good. Come forward please. |
| Deputy Anderson: | 293. |
|  | (Conference at the bench between court and juror. ) |
| The Court: | Geneva Bradley? How far did you go in school? |
| Juror Bradley: | Sixth. Sixth grade. |
| The Court: | Well, you have to know our ABC's, you have to know how to count. |
| Juror Bradley: | I know all of that. I know all of that. |
| The Court: | Who filled this form here out? |
| Juror Bradley: | I got my sister-in-law. Her name is Debra. |
| The Court: | You got who to fill it out? |
| Juror Bradley: | My sister-in-law. Her name is Debra. |
| The Court: | Where is she? |
| Juror Bradley: | I don't know. |
| The Court: | You can't fill out your own form? |
| Juror Bradley: | I can fill out some things. |
| The Court: | What are you doing about your problem? are you - - do you know they have courses over in the library in Cleveland? |
| Juror Bradley: | I ain't going to school. I hadn't started to school because I have - - my mother is sick and stuff, I just hadn't yet. |
| The Court: | Do you have a driver's license? |
| Juror Bradley: | No. |
| The Court: | Why you don't have a driver's license? |
| Juror Bradley: | Well, I just hadn't gotten it. |
| The Court: | All right. you may go. |
| Juror Bradley: | Thank you. |
| The Court: | 293 |
|  | (Juror no. 293 excused.) |

¶179. Scott claims that Bradley was never asked directly whether she could read and understand documents. Scott then argues that it is just as plausible that she suffered from a "physical limitation" that prevented her from writing or driving than that she could not read or understand court documents. Scott continues this logic by citing to numerous cases concerning equal protection and citing cases that do not

allow the disabled to be excluded from jury service simply because of a disability. He concludes his argument by asserting that his conviction must be vacated because his constitutional rights were violated by excluding Juror Bradley from the jury without knowing why she was unable to complete the questionnaire.

¶180. This Court has upheld the requirement that jurors must have the ability to read and write. In *Edwards v. State*, 737 So.2d 275, 318-19 (Miss. 1999), a death penalty case, this Court held that Miss. Code Ann. § 13-5-1 literacy requirements are constitutional. Other cases have stated the following:

> It is unclear from Milano's brief exactly what his complaint is in regards to Miss. Code Ann. § 13-5-1 other than unconstitutionality. This statute provides that the jury venire can be composed of (1) qualified electors, (2) persons 21 or older, and (3) persons who can read and write. Miss.Code Ann. § 13-5-1.

> This Court has previously considered the exclusion of persons under age 21 from jury service and has consistently held that the exclusion does not violate the state or federal constitution. *Turner v. State*, 573 So.2d 657, 666 (Miss.1990), rev'd on other grounds; *Irving v. State*, 498 So.2d 305, 319 (Miss.1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); *Fermo v. State*, 370 So.2d 930, 934 (Miss.1979); *Joyce v. State*, 327 So.2d 255, 261 (Miss.1976); *Johnson v. State*, 260 So.2d 436, 437 (Miss.1972).

> Additionally, this Court has also upheld the requirement that jurors are required to be literate.

In *Milano* this Court relied upon *Terrell v. State*, 262 So.2d 179 (Miss.1972) which ruled on "the predecessor statute to § 13-5-1, which also required that a prospective juror be able to read and write." The Court reasoned that with the mix of cases in the court system in addition to the "numerous written documents that are introduced into evidence, the requirement that a juror be able to read and write is reasonable." Literacy requirements pursuant to § 13-5-1 are constitutional. *Id*. Indeed, in the murder case, *Wilson v. State*, 574 So.2d 1324, 1331 (Miss. 1990), this Court stated that the Legislature has "the power to prescribe the qualifications for jurors" and the "right to impose reasonable qualifications for

jurors when such qualifications do not violate the constitutional rights of accused persons to be tried by an impartial jury." *See also **Jordan v. State***, 786 So.2d 987, 1023-24 (Miss. 2001) ("We have held that Mississippi's jury eligibility statute with regard to age and literacy is constitutional").

¶181. We find that this issue is without merit. The Legislature may impose reasonable requirements for qualifying a prospective juror. ***Wilson***, 574 So.2d at 1331. Miss. Code Ann. § 13-5-1 places a literacy requirement on prospective jurors which this Court has upheld on numerous occasions. This Court finds that the record reflects that the trial judge asked if there was anyone that could not read or write in the jury. While Juror Bradley did not initially respond, she did come up to the bench and explain that she had someone else filled out the questionnaire. She stated that she fill out "some things" on the form.

¶182. The statute requires that a prospective juror who cannot complete the above form shall be disqualified as a juror and discharged. Clearly, Juror Bradley stated that she could fill out some of the form and she had her sister-in-law actually fill out the form for her. This Court finds that the trial judge was within his discretion when he dismissed Juror Bradley based upon her answers and inability to complete the form. Scott's argument that Juror Bradley was perhaps suffering from a physical limitation and also that she was somehow a disabled person, this Court finds, is unfounded and speculative. Furthermore, we find that the last alternate juror in this case was juror 71, accordingly Juror Bradley as juror 293 would never have been on the jury in any event, and thus Scott cannot support a claim that Juror Bradley's discharge in any way affected the final make up of his jury panel.

## XXIII. Discrimination: Race of the victim and race of the offender.

¶183. Scott argues that there is discrimination on the application of the death penalty in Mississippi. In this case, Scott, a black male, was convicted of killing Lee, a white male. He claims that because he is a black defendant and the victim is white, the race differences increases his chances of receiving the death

penalty by 500%. Scott suggests a reexamination of *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). ¶184. The State argues that Scott never raised this issue at trial, and it is therefore barred. In the alternative, the State claims that Scott conceded that his argument is legally insufficient. Indeed, the brief filed by Scott contains a section starting at issue XXII entitled as "preservation issues" with a footnote stating:

> As this is a capital case, Appellant has raised several issues which either this Court or the United States Supreme Court has previously overruled. Appellant concedes the following issues are foreclosed by existing precedent of the court and under a normal appeal he would not address these issues; death, in its finality and byzantine rules of procedure, is different. These issues are raised solely on a good faith basis to provide this Court an opportunity to review its or the United States Supreme Court holdings (where so possible), as well as to protect Scott's full panoply of rights should counsel have misguaged the perceived strength of the issues raised herein and this Court deny Scott relief.
>
> Finally, Scott presents these issues in order to preserve these issues for federal review, either by the Supreme Court or lesser federal court.

In *McCleskey*, the Court stated:

> Our analysis begins with the basic principle that a defendant who alleges an equal protection violation has the *burden of proving "the existence of purposeful discrimination*." ***Whitus v. Georgia***, 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967). [FN10] A corollary to this principle is that a criminal defendant must prove that the purposeful discrimination "had a discriminatory effect" on him. ***Wayte v. United States***, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985). Thus, to prevail under the Equal Protecti

on Clause, *McCleskey must prove that the decisionmakers in his case acted with discriminatory purpose*. He offers no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence. Instead,

he relies solely on the Baldus study. [FN11] McCleskey argues that the Baldus study compels an inference that his sentence rests on purposeful discrimination. McCleskey's claim that these statistics are sufficient proof of discrimination, without regard to the facts of a particular case,

87

> would
> extend
> to all
> capital
> cases in
> Georgi
> a, at
> least
> where
> the
> victim
> was
> white
> and the
> defend
> ant is
> black.

*McCleskey*, 481 U.S. at 292-93 (footnotes omitted). Therefore, pursuant to *McCleskey*, Scott has the burden of proving the existence of purposeful discrimination and in that he must prove that "the decisionmakers in *his case* acted with discriminatory purpose." *Id.* Scott has cited no instance in the record where the decisionmakers in *his* capital murder case acted with a discriminatory purpose. In *McCleskey*, the United States Supreme Court found that the study was "insufficient to support an inference that any of the decisionmakers in McCleskey's case acted with discriminatory purpose." *Id*. at 297. In the case sub judice, Scott only cites to some studies. In *Underwood v. State*, 708 So.2d 18, 38 (Miss. 1998), this Court reviewed whether the death penalty can be applied fairly or in compliance with equal protection when it is allegedly disproportionately applied against black defendants in Mississippi. This Court held:

> The United States Supreme Court rejected this identical argument in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). McCleskey argued that Georgia's capital punishment statute violated equal protection, based upon a study showing that black defendants were more likely to be sentenced to death than white defendants, and defendants murdering whites were more likely to be sentenced to death than

defendants who murdered blacks. *McCleskey*, 481 U.S. at 291-92, 107 S.Ct. at 1766-67. The Court held that in order to raise a successful claim of an equal protection violation, the criminal defendant must prove that "the decisionmakers in his case acted with discriminatory purpose." *Id*. at 292, 107 S.Ct. at 1767. McCleskey's only proof supporting his claim were the results of the study. The Court determined that due to the number of variables inherent in capital sentencing and the discretion allowed trial courts in implementing criminal justice, the use of statistical evidence was insufficient to prove purposeful discrimination. *Id*. at 292-97, 107 S.Ct. at 1767-70.

Underwood has failed to offer any substantial proof that the death penalty is applied in a discriminatory manner in Mississippi today, or that he suffered discriminatory application of the law. Underwood's argument is based solely on insufficient statistical evidence and the bald assertion that had he been convicted of murdering an African-American instead of a white woman, he would have been sentenced to life imprisonment. We refuse to reverse Underwood's sentence of death based upon this assignment of error.

708 So.2d at 38.

¶185.  This Court finds that Scott has not shown any proof as to how the decionsmakers in his case acted with a discriminatory intent. Without specific examples demonstrating discrimination by the decisionmakers, we find that there is nothing for this Court to review and make a ruling, accordingly this issue is without merit.

### XXIV.  Aggravating Circumstance.

¶186.  Scott argues that at least one and probably all three of the aggravating circumstances in this case were invalid.  Thus, Scott contends that the remedy is to reverse and remand for a new trial, and there is no option of reweighing or applying a harmless error analysis pursuant to Miss. Code Ann § 99-19-105.[8]

---

[8]  Miss Code Ann. § 99-19-105 states in part:

(3)      With regard to the sentence, the court shall determine:
  (a)      Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
  **(b)      Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;**
  (c)      Whether the sentence of death is excessive or disproportionate to

Scott states that the three (3) aggravating circumstances found by the jury were "[w]hether (1) the capital offense was committed for the purpose or avoiding a lawful arrest, (2) the capital offense was committed while the defendant was engaged or was an accomplice in the commission of the crime of robbery, and (3) the capital offense was especially heinous, atrocious or cruel." The State correctly claims that only two of the three alleged aggravating circumstances were considered by the jury in their instructions.[9]

¶187. The actual sentencing instruction, S-1A, stated in part:

> the penalty imposed in similar cases, considering both the crime and the defendant; and
>
> **(d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both...**
>
> (5) The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:
>
> (a) Affirm the sentence of death;
>
> (b) Reweigh the remaining aggravating circumstances against the mitigating circumstances should one or more of the aggravating circumstances be found to be invalid, and (i) affirm the sentence of death or (ii) hold the error in the sentence phase harmless error and affirm the sentence of death or (iii) remand the case for a new sentencing hearing; or
>
> (c) Set the sentence aside and remand the case for modification of the sentence to imprisonment for life.

[9] Miss. Code Ann. § 99-19-101(3) states in part that aggravating circumstances shall be limited to the following:

> (d) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery...
>
> (e) The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
>
> (h) The capital offense was especially heinous, atrocious or cruel.

To return that death penalty you must find that the mitigating circumstances - - those which tend to warrant the less severe penalty of life imprisonment without parole - - do not outweigh the aggravating circumstances - - those which tend to warrant the death penalty.

Consider only the following elements of aggravation in determining whether the death penalty should be imposed:

(1)     whether the capital offense was committed for the purpose of avoiding or preventing a lawful arrest,

(2)     Whether the capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of the crime of robbery.

You must unanimously find, beyond a reasonable doubt, that one or more of the preceding aggravating circumstances exists in this case to return the death penalty. If none of these aggravating circumstances are found to exist, the death penalty may not be imposed...

¶188.   The jury verdict read into the record stated that the jury found the aggravating circumstances that the capital murder was committed for the purpose of avoiding or protecting a lawful arrest and while the defendant was engaged or was an accomplice in the commission of the crime of robbery. Accordingly, the alleged aggravating circumstance that the capital offense was especially heinous, atrocious or cruel was not submitted to the jury and this Court finds that any argument referencing this alleged factor will not be considered by this Court. However, Scott does argue that the avoiding lawful arrest circumstance was invalid because there was insufficient evidence. He does not argue anything in regard to the second given aggravating circumstance of whether the capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of the crime of robbery. Therefore, only the issue of whether the avoiding lawful arrest will be discussed by this Court.

¶189.   In the post-conviction relief case, *Wiley v. State*, 750 So.2d 1193, 1206 (Miss. 2000), this Court set forth the standard of review for the sufficiency of the evidence to support an instruction for avoiding lawful arrest, stating:

91

> Each case must be decided on its own peculiar facts. If there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance. *Chase v. State*, 645 So.2d 829, 858 (Miss.1994) (quoting *Hansen v. State*, 592 So.2d 114, 153 (Miss.1991)).

*Wiley*, 750 So.2d at 1206.

¶190. Thus, this Court must determine "whether there is any credible evidence upon which the jury could find the aggravating circumstance in question." *Id*. (quoting *Woodward v. State*, 726 So.2d 524, 541 (Miss. 1997)). In *McGilberry v. State*, 843 So.2d at 29, this Court addressed the aggravating circumstance of whether McGilberry created a great risk of death to many persons. In its opinion this Court held that "[i]f one aggravator is found to be invalid, we are authorized to reweigh the remaining aggravators against the mitigating circumstances and affirm, hold the error to be harmless, or remand for a new sentencing hearing. Miss. Code Ann. § 99-19-105(5)(b) (Rev. 2000)."

¶191. Reviewing the facts of this case, this Court finds that there is abundant evidence to support the aggravating circumstance that the capital offense was committed by Scott for the purpose of avoiding or preventing a lawful arrest. Lurline testified that sometime after noon Scott saw her open the door to her house and he then shot at her two times. Lee was shot and killed in his driveway. Officer Haney spotted a car that met the description of the Lee's vehicle. He pursued the vehicle with his blue lights on, traveling up to 115 miles per hour at one point, yet the driver of the car never pulled over to the side of the road. By the time Officer Haney turned onto Bobo Road, the vehicle was gone leaving only tracks on the ground. When the police found the empty vehicle near an old gin, the driver was not present at the scene. Scott stopped at the Ivy's home around 12:30 to 1:00 p.m. in Bobo to ask for a ride home, both Doris and Steven noticed that Scott was sweating and that he had no jacket. Officer Estes testified that the Lee's

vehicle, a gun, a bloody jacket containing Scott's driver's license, a letter from Scott's girlfriend and some other items were found near the gin. While driving Scott home, Steven observed Scott looking at the gin.

¶192. This Court finds that the evidence shows that the person that Lurline identified as Scott was clearly trying to avoid lawful arrest. Sometime near noon, Scott shot at her twice when she came to her door and spoke to her husband, who was at that point still inside his automobile. Officer Haney pursued a driver in a vehicle that matched the description of the Lee's vehicle and despite flashing the blue lights and traveling near 115 miles per hour in pursuit, the driver never pulled the vehicle over the side of the road. The Lee's automobile was later found abandoned in the old gin by police. Various articles such as a bloody coat, gun, and Scott's driver's licence and letter from his girlfriend were found near the old gin and the Lee's abandoned automobile.

¶193. Other witnesses testified that Scott came by their house sweating and without a jacket around 12:30 to 1:00 p.m. asking for a ride home. On the drive back to his house, Scott looked over at the gin. Clearly, the preceding evidence supports an aggravating circumstances that Scott tried to avoid lawful arrest by shooting at a potential witness, Lurline, that could identify him; taking a vehicle that was not his and refusing to stop the vehicle when pursued by police; dumping items of evidence; and asking for a ride back home to get farther away from the crime scene rather than going to the police station. This Court finds that there is sufficient evidence to support the aggravating circumstance presented at trial. Therefore, this issue is without merit.

## XXV. Cumulative Error

¶194. Scott argues that the cumulative effect of the errors in his trial warrant reversal. In *Wilburn v. State*, 608 So.2d 702, 705 (Miss. 1992), this Court held that "individual errors, not reversible in themselves, may combine with other errors to make up reversible error." The question that must be asked

93

in these instances is whether the defendant was deprived of a "fundamentally fair and impartial trial" as a results of the cumulative effect of all errors at trial. *Id*. If there is "no reversible error in any part, so there is no reversible error to the whole. *McFee v. State*, 511 So.2d 130, 136 (Miss. 1987).

¶195.   None of the issues raised by Scott in this assignment or any of those discussed previously, rise to the level of reversible error either standing alone or when considered together. The verdict finds substantial support in the evidence and Scott failed to demonstrate any procedural or substantive errors that warrant reversal.   Based on the finding of no error, this Court finds that  there is no cumulative effect for all the alleged errors and, therefore, his convictions and sentences should be affirmed by this Court.

### XXVI.   Proportionality Review of Death Sentence

¶196.   Miss. Code Ann. § 99-19-105(3) (2000) requires this Court to perform a proportionality review of a death sentence in a capital case.  Section 99-19-105(3) states:

> (3)      With regard to the sentence, the court shall determine:
>
>    (a)      Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
>    (b)      Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;
>    (c)      Whether the sentence of death is excessive of disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and
>    (d)      Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstances was harmless error, or both.

¶197.   After reviewing the record in this appeal as well as the death penalty cases listed in the appendix, we conclude that Scott's death sentence was not imposed under the influence of passion, prejudice, or any other factor.  We further find that the evidence is more than sufficient to support the jury's finding of

statutory aggravating circumstances. In comparison to other factually similar cases where the death sentences was imposed, the sentence of death is neither excessive of disproportionate in this case. Finally, the jury did not consider any invalid aggravating circumstances. Therefore, we affirm the death sentence imposed in this case.

## CONCLUSION

¶198. For these reasons, the judgment of the Bolivar County Circuit Court is affirmed.

¶199. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Byrom v. State,* 863 So.2d 836 (Miss. 2003).

*Howell v. State,* 860 So.2d 704 (Miss. 2003).

*Howard v. State,* 853 So.2d 781 (Miss. 2003).

*Walker v. State,* 815 So.2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So.2d 934 (Miss. 2002).

*Stevens v. State,* 806 So.2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So.2d 241 (Miss. 2002).

*Knox v. State,* 805 So.2d 527 (Miss. 2002).

*Simmons v. State,* 805 So.2d 452 (Miss. 2002).

*Berry v. State,* 802 So.2d 1033 (Miss. 2001).

*Snow v. State*, 800 So.2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999).

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).       *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

i

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

## **DEATH CASES AFFIRMED BY THIS COURT**

## **(continued)**

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

***Jones v. State***, 517 So. 2d 1295 (Miss. 1987)*, **Jones v. Mississippi**,* 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So.  2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

# DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

   * Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

# DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE

*Flowers v. State,* 842 So.2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE
### (continued)

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

# DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## <u>FOR RESENTENCING TO LIFE IMPRISONMENT</u>

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# ON SENTENCING PHASE ONLY

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

   ***Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi***, 498 U.S. 1 (1990) reversing, in part, and remanding, ***Shell v. State*** 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

   ***Pinkney v. State***, 538 So. 2d 329 (Miss. 1989), ***Pinkney v. Mississippi,*** 494 U.S. 1075 (1990) vacating and remanding, ***Pinkney v. State,*** 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

   ***Clemons v. State***, 535 So. 2d 1354 (Miss. 1988), ***Clemons v. Mississippi***, 494 U.S. 738 (1990) vacating and remanding, ***Clemons v. State***, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

   ***Jones v. State***, 517 So. 2d 1295 (Miss. 1987), ***Jones v. Mississippi,*** 487 U.S. 1230 (1988) vacating and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

**DEATH CASES REVERSED AS TO
PUNISHMENT AND REMANDED FOR A NEW TRIAL
ON SENTENCING PHASE ONLY
(continued)**

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). * Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.